**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Kenneth C. FITZGIBBON,**
**Defendant-Appellant.**

**No. 79–1281.**

United States Court of Appeals,
Tenth Circuit.

Submitted March 11, 1980.

Decided April 22, 1980.

Joseph F. Dolan, U. S. Atty., and Rod W. Snow, Asst. U. S. Atty., Denver, Colo., for plaintiff-appellee.

Richard S. Henderson, San Diego, Cal., for defendant-appellant.

Before SETH, Chief Judge, McWIL-LIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Kenneth C. Fitzgibbon (Fitzgibbon) appeals from a judgment denying his motion to vacate sentence imposed pursuant to 28 U.S.C. § 2255.

### Background

Fitzgibbon is presently incarcerated following his conviction by a jury of knowingly and willfully making a false statement in violation of 18 U.S.C. § 1001, in connection with carrying on his person foreign currency in excess of $5,000.00 through United States Customs. This court affirmed. *See: United States v. Fitzgibbon*, 576 F.2d 279 (10th Cir. 1978), *cert. denied*, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978).

The facts, in summary, leading to Fitzgibbon's conviction and sentence in the United States District Court for the District of Colorado are: Fitzgibbon entered the United States on a flight from Canada and, upon arrival in Denver on March 31, 1977, he tendered to a U. S. Customs official Customs Form 6059–B entitled "Customs Declaration"—given to all incoming passengers; the form asks whether the person responding or anyone in his or her party is carrying over $5,000.00 in coin, currency or monetary instruments; Fitzgibbon checked a "no" response to that question, and, in addition, he gave a similar oral response to a Customs official following his arrival at Stapleton International Airport in Denver, Colorado; nothing on Form 6059–B advised Fitzgibbon of the reporting requirements of the Bank Secrecy Act of 1970, Pub.L. No. 91–508, 84 Stat. 1114 (1970) (codified in scattered sections of 12, 31 U.S.C.); Customs Officer Lockhart, after inquiring of Fitzgibbon orally, received a negative verbal response to the identical question posed on Form 6059–B relative to possession of currency in excess of $5,000.00, together with Fitzgibbon's explanation that he had been in Canada overnight and had not acquired anything during the trip; Lockhart observed that Fitzgibbon was hesitant and

nervous, and thus decided that a secondary examination was required; after Fitzgibbon was taken to a separate room, currency in excess of $10,000.00 was found in Fitzgibbon's boots when he removed them; after receiving *Miranda* warnings, Fitzgibbon stated that he had acquired the money in Canada and that he did not want to "hassle" with Internal Revenue over it because a "portion" of it was not his, but rather belonged to an individual residing in New Jersey.

*The indictment upon which Fitzgibbon was convicted and subsequently sentenced relied solely upon the charge that he knowingly and willfully made a false statement in completing Customs Form 6059–B relative to the currency inquiry.*

Fitzgibbon's direct appeal to this Court from his initial conviction was anchored to two primary contentions: *First*, that the indictment was defective because it did not specifically cite the federal regulation defining the term "monetary instruments" contained in the statute as including Canadian currency, and, *second*, that the Customs form referred to was a "baggage declaration" and, thus, not a proper form. These contentions were held to be without merit. *See: United States v. Fitzgibbon, supra.*

Following our affirmance of Fitzgibbon's conviction, he was incarcerated in the federal prison at Lompoc, California. On November 13, 1978, Fitzgibbon filed his motion pursuant to the federal habeas corpus statute, 28 U.S.C. § 2255, to vacate and set aside his sentence. The District Court denied Fitzgibbon's motion in a Memorandum Opinion and Order.

On appeal, Fitzgibbon contends that the District Court erred in failing to grant his motion in that: (1) he was denied effective assistance of counsel at trial, inasmuch as his attorney failed to raise the so-called "exculpatory no" defense to the 18 U.S.C. § 1001 charge, and (2) the "farce, sham or mockery of justice" test should not have been applied in determining whether his effective assistance of counsel claim was valid.

## I.

Fitzgibbon contends that, "Because of the 'exculpatory no' defense, the checking of the box 'no' and the oral 'no' to the inquiry as to whether a traveler brings more than $5,000.00 from abroad into the United States is outside the scope of the offense of making a false statement in violation of 18 U.S.C. Sec. 1001 and, standing alone, these facts could not bottom a finding beyond a reasonable doubt that Fitzgibbon had knowingly and willfully violated that Section as a matter of law. The failure to raise the defense [i. e., the "exculpatory no" defense], ipso facto, demonstrates lack of effective assistance of counsel." [Opening brief of appellant at p. 3].

We first observe, as did the District Court [R., Vol. I, p. 66], that the "exculpatory no" defense was raised by counsel for Fitzgibbon before the trial court in a motion to dismiss for failure to charge an offense; on appeal to this Court; and in a petition for writ of certiorari denied by the Supreme Court. Thus, a serious question exists as to whether Fitzgibbon is estopped from raising the same issue in this habeas corpus posture. We elect to reach the issue both because it was apparently not properly articulated in the prior proceedings and because it is an issue which has not been previously decided by this Court directly in the context of the facts of this case.

18 U.S.C. § 1001 provides that:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

### The "Exculpatory No" Exception

The predicate of the "exculpatory no" defense is simply that a negative response cannot serve as proof of the requisite knowledge and willfulness required to convict under 18 U.S.C. § 1001, absent affirmative steps taken by the government to make the reporting requirements of the law known.

A confession is a species of admissions. It is an acknowledgment in express words, by the accused in a criminal case, of the truth of the *guilty fact* charged or of some essential part of it. Exculpatory statements, denying guilt, are not confessions. Wigmore on Evidence, 3rd Ed., Vol. 3, § 821. A "confession" leaves nothing to be determined. It is a defendant's acknowledgment of his intentional participation in the criminal act. An "admission", on the other hand, constitutes a mere recital of facts which tend to establish guilt. Thus, an "exculpatory statement" has been described as a statement which tends to justify, excuse or clear a defendant from alleged fault or guilt.

Fitzgibbon's primary reliance on the "exculpatory no" defense is the decision rendered by the Fifth Circuit in *United States v. Schnaiderman*, 568 F.2d 1208 (5th Cir. 1978). The court there held that the "exculpatory no" defense applied in a prosecution almost identical to Fitzgibbon's; Schnaiderman's conviction was reversed. The facts in *Schnaiderman* are: Schnaiderman, a Venezuelan resident, arrived at Miami International Airport and entered the United States Customs line; he presented Customs Declaration Form 6059–B, which he had not completed; the Customs Inspector directed Schnaiderman to complete and sign the form, which he did; when Schnaiderman reappeared in the line, he handed the inspector Form 6059–B completed and signed; on the form, Schnaiderman checked the "no" answer to the inquiry relative to whether he was carrying cash or negotiable instruments in excess of $5,000.00; and, in addition, he orally responded "no" when Customs Inspector Randall verbally inquired as to whether he was carrying more than $5,000.00; when Schnaiderman passed on to Customs Inspector Deeley in the line, it was observed that Schnaiderman's pock-

ets were bulging and that he was nervous; Schnaiderman was asked to empty his pockets and thereupon $8,086.00 was found on his person; when Inspector Deeley inquired of Schnaiderman whether he understood United States currency laws, Schnaiderman responded that he was aware of the laws but that he was not going to spend the money in the United States.

Schnaiderman was charged with violating 18 U.S.C. §§ 1001 and 1058. On appeal, he asserted that there was insufficient evidence, as a matter of law, to prove that he intentionally violated these statutes. He argued that the "exculpatory no" exception applied to the negative response to the question posed on Form 6059-B and the identical oral response he made to Customs Inspector Randall. The Court agreed, reasoning that since 18 U.S.C. § 1001 requires "knowing" transportation and since 31 U.S.C. § 1058 requires a "willful" violation, there must be proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime. The Court cited to its prior opinion in *United States v. Granda*, 565 F.2d 922 (5th Cir. 1978) which followed *United States v. San Juan*, 545 F.2d 314 (2nd Cir. 1976).

In *Granda*, the Court, in disposing of the Government's argument that the question on Form 6059-B relative to currency in excess of $5,000.00 put the traveler on notice that he must file the report on Form 4790, stated:

> . . . The failure of the government to make known the requirements of the statute is fatal to their case. The isolated act of bringing money in excess of $5,000 into the country is not illegal or even immoral. What is required is merely a filing of the proper form. Proof of the requisite knowledge and willfulness, therefore, is almost impossible unless affirmative steps are taken by the government to make the laws' requirements known. The government argues that the defendant was made aware of the reporting requirement by the question on the customs declaration form asking whether the defendant was carrying more than

$5,000. We do not agree. The effect, if any, of this question is merely to cause the traveler to think that it is illegal to carry a large amount of money into the country. The question in no way tells the traveler it is perfectly legal to enter or leave the country with more than $5,000 but that a form reporting this fact must be completed. Nor does the untruthful answer of the question by the defendant prove beyond a reasonable doubt that she knew she was supposed to fill out a form. An untruthful answer could very easily be prompted by the question on the form which might cause the traveler who enters the country with more than $5,000 to think that his or her possession is by itself illegal, and who therefore answers untruthfully in order to attempt to avoid being caught breaking the law. We do not accept the government's contention that the defendant's falsification of her declaration forms proves that she was aware of the separate reporting requirement.

565 F.2d at p. 926.

Thus, the *Schnaiderman* court came down with a rule preventing prosecution of a person, such as Fitzgibbon, who simply and *only* responded "no" to the currency inquiries in that the "exculpatory no" could not satisfy the requisite proof of knowledge and willful intent. Such could be satisfied if the defendant is specifically informed of the reporting requirements mandated in *Granda* prior to responding to the Bank Secrecy Act, *supra*, currency inquiries. *Accord: United States v. Beer*, 518 F.2d 168 (5th Cir. 1975); *United States v. Bush*, 503 F.2d 813 (5th Cir. 1974). *See also: United States v. Chevoor*, 526 F.2d 178 (1st Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976) (negative responses given to FBI agents by a prospective grand jury witness).

### The Legislative History of § 1001

The predecessor of § 1001 condemned only false claims designed to defraud the United States of its property. In 1934, the statute was amended "to protect the autho-

rized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941). From that date forward, proof of pecuniary loss to the United States was no longer required. *United States v. Beacon Brass Co.,* 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61 (1952) announced that there is no distinction between oral and written statements under this section, and *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955) recognized that 18 U.S.C. § 1001 must be accorded a broad and liberal interpretation in order to accommodate the congressional desire that its enactment lessen the likelihood of future false claims aimed at defrauding the Government "in the wake of a spate of frauds upon the Government." In *Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969), the Supreme Court made it clear that the term "jurisdiction" in relation to federal agencies was not to be construed narrowly:

> As another element of the offense, § 1001 requires that the false statement be made "in any matter within the jurisdiction of any department or agency of the United States." . . . Because there is a valid legislative interest in protecting the integrity of official inquiries, see *United States v. Bramblett . . . United States v. Gilliland . . .* we think the term "jurisdiction" should not be given a narrow or technical meaning for purposes of § 1001. . . . A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001.

396 U.S. at pp. 70–71, 90 S.Ct. at p. 359.

Thus, in accord with *Bryson, supra,* § 1001 has been interpreted broadly and liberally so as to apply to statements not required by law, not under oath, and not in writing made in the exercise of routine governmental administrative duties and which do not involve the possibility of self-incrimination. *United States v. Bettenhausen,* 499 F.2d 1223 (10th Cir. 1974);

*Knowles v. United States,* 224 F.2d 168 (10th Cir. 1955). *See also: United States v. Rose,* 570 F.2d 1358 (9th Cir. 1978); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir. 1973), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. Protch,* 481 F.2d 647 (3rd Cir. 1973); *United States v. Adler,* 380 F.2d 917 (2nd Cir. 1967), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1968); *United States v. McCue,* 301 F.2d 452 (2nd Cir. 1962), *cert. denied,* 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962).

Any doubt concerning the need of the United States Customs officials for the "currency" information sought from Fitzgibbon within the administrative "jurisdiction" of the agency is dispelled by this language in *California Bankers Assn. v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974):

> Chapter 3 of Title II of the Act and the regulations promulgated thereunder generally require persons to report the transportation of monetary instruments into or out of the United States, or receipts of such instruments in the United States from places outside the United States, if the transportation or receipt involves instruments of a value greater than $5,000. Chapter 4 of Title II of the Act and the implementing regulations generally require United States citizens, residents, and businessmen to file reports of their relationships with foreign financial institutions. The legislative history of the foreign-transaction reporting provisions indicates that the Congress was concerned with the circumvention of United States regulatory, tax, and criminal laws which United States citizens and residents were accomplishing through the medium of secret foreign bank transactions. S.Rep.No.91–1139, *supra,* at 7; H.R.Rep.No.91–975, *supra,* at 13.
>
> Section 231 of the Act, 31 U.S.C. § 1101, requires anyone connected with the transaction to report, in the manner prescribed by the Secretary, the transportation into or out of the country of monetary instruments exceeding $5,000 on any

one occasion. As provided by the Secretary's regulations, the report must include information as to the amount of the instrument, the date of receipt, the form of instrument, and the person from whom it was received. See 31 CFR §§ 103.23, 103.25. The regulations exempt various classes of persons from this reporting requirement, including banks, brokers or other dealers in securities, common carriers, and others engaged in the business of transporting currency for banks. 31 CFR § 103.23(c). Monetary instruments which are transported without the filing of a required report, or with a materially erroneous report, are subject to forfeiture under § 232 of the Act, 31 U.S.C. § 1102; a person who has failed to file the required report or who has filed a false report is subject to civil penalties under §§ 207 and 233, 31 U.S.C. §§ 1056 and 1103, as well as criminal penalties under §§ 209 and 210, 31 U.S.C. §§ 1058 and 1059.

416 U.S. at pp. 35–36, 94 S.Ct. at pp. 1504–1505. [Footnotes omitted].

### Our Disposition

The elements of the offense identified in 18 U.S.C. § 1001, as amended, are 1) that the defendant made a statement, 2) that the statement was false and the defendant knew it was false, 3) the statement was made knowingly and willfully, 4) the statement was within the jurisdiction of the federal agency, and 5) the statement was material. We hold that these elements were established in Fitzgibbon's trial and that the "exculpatory no" defense cannot prevail.

In *United States v. Rose*, 570 F.2d 1358 (9th Cir. 1978), the defendant's conviction on two counts of violating 18 U.S.C. § 1001 was affirmed under facts strikingly similar to those involved in the case at bar. In *Rose*, the appellant (Rose) entered a United States Customs inspection border site at Blaine, Washington, adjacent to Canada. Rose gave false responses to a routine series of questions posed by the United States Customs agents. When asked what merchandise he was importing subject to declaration, Rose responded that he had only two cameras to declare when in fact he knew he was also carrying ergatomine tartrate (an alpha adrenergic blocking agent), a dutiable item he acquired abroad. In affirming the conviction of Rose grounded to the 18 U.S.C. § 1001 counts, the court rejected the "exculpatory no" defense:

Although the statement in this case was oral, unsworn and unrelated to any monetary claim against the United States, the declarant was claiming the privilege of entry, and his statement potentially impaired the function of the Customs Service.

The border agent testified that persons coming from overseas were referred automatically to a more rigorous inspection than those who had stayed in Canada. Instead of referring Rose for secondary inspection, the agent testified that he had been on the verge of letting him proceed. Although in this factual situation contraband was not allowed into the United States by Rose's statement, the statement had the "intrinsic" capability of bringing it about. *United States v. Quirk*, 167 F.Supp. 462, 464 (E.D.Pa.1958), *aff'd* 266 F.2d 26 (3rd Cir. 1959), *quoted in Brandow v. United States*, 268 F.2d 559, 565 (9th Cir. 1959).

*United States v. Bush*, 503 F.2d 813 (5th Cir. 1974), relied on by appellant, is distinguishable. In that case, Bush was asked by an agent of the Internal Revenue Service whether he had committed a suspected misdeed. He answered with an untruthful "exculpatory 'no'." 503 F.2d at 819. Relying on its understanding of the congressional intent and influenced by Fifth Amendment concerns, the court reversed the conviction. It found that the "exculpatory no" fit within an investigatory exception to § 1001.

In our case, the border agent's inquiries were a routine exercise of his *administrative* responsibility. Moreover, a truthful answer to the inquiries would not have involved self-incrimination. We conclude that the false statement appellant made to the agent at the border crossing was material within the meaning of § 1001.

570 F.2d at p. 1364.

The conflict between the Ninth Circuit's holding in *United States v. Rose, supra,* and the Fifth Circuit's embrace of the "exculpatory no" defense is well delineated, we believe, by this language stated in *United States v. London,* 550 F.2d 206 (5th Cir. 1977):

> Section 1001 contains three operative clauses. The third concerns one who makes false writings, the second one who makes false statements or representations, and the first one who "falsifies, conceals or covers up by any trick, scheme, or device . . ." The phrase "by trick, scheme, or device" obviously modifies all three preceding verbs. Had their intentions been otherwise the authors of the statute would have placed the non-modified verbs directly after the "by trick, scheme, or device" phrase.
>
> \* \* \* \* \* \*
>
> This construction of the statute is supported by policy considerations. In construing a statute that will often come dangerously close to trenching on fifth amendment rights, one ought not punish concealments or false statements that fall short of constituting affirmative acts . . . The requirement of an affirmative act is implied in the second clause of § 1001 by the statute's proscription of false *statements* . . . Unless full effect is given to the "trick, scheme, or device" phrase in the first clause, however, it would be possible to construe the terms "conceal or cover up" to embrace mere nondisclosure.
>
> We have held, in enunciating the so-called "exculpatory no" doctrine, that essentially negative answers to questions propounded by investigating government officials are not statements within the meaning of the second clause of § 1001 in the absence of some affirmative, aggressive, or overt falsehood on the defendant's part.

550 F.2d at pp. 212–213.

We agree with the rationale set forth in *United States v. Rose, supra.* Such is compatible with this broad-sweeping language in *Bryson v. United States, supra:*

> A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.

396 U.S. at p. 72, 90 S.Ct. at p. 360.

In *United States v. Fitzgibbon, supra,* we implicitly held that the "exculpatory no" defense was not available to Fitzgibbon in light of the fact that when his flight arrived in Denver, he and all other incoming passengers were greeted in the Customs inspection area of the airport with prominent posters on the walls advising them that incoming travelers were obligated to report currency or monetary instruments exceeding $5,000.00 in value. In addition, we deem it important to observe that Customs Form 6059–B contained a clear and unequivocal instruction immediately above the signature space that *all* ". . . oral and written statements which I have made are true, correct and complete." In addition, the form stated, in bold print, that "False Statements Made To A Customs Officer Are Punishable by Law".

■ In our view, the facts of the instant case do not "fit the mold" of the "exculpatory no" exception applied by the Fifth Circuit. The sole charge was based on the false statement Fitzgibbon submitted on the face of the Customs form he completed, signed and delivered. Under the statute, the submission of the form to Fitzgibbon while on board the flight was exclusively administrative in nature. There was no indication of criminal investigation or police coercion. Fitzgibbon clearly understood that completion of the form was required prior to entry into the United States, and that the false statements he made were designed to conceal information relevant to the administrative process:

> He made a statement from which it could reasonably be inferred he knew of the requirement when he said he wanted to avoid a hassle with the United States Internal Revenue Service. Further, the fact he carried the money in his boots rather than in his wallet or in his pockets

supports the inference he was attempting to hide it. His possession of a false driver's license, and his "no" answers to repeated questions about whether he acquired anything in Canada and whether he had money would support the conclusion he knew of the reporting requirement.

576 F.2d 279 at p. 284.

It is important, in our view, to note that the question posed on the Customs declaration form, and orally asked by Customs Inspector Lockhart, could not have been incriminating, simply because it is not a crime to transport more than $5,000.00 into the United States. Rather, 31 U.S.C. § 1058 declares it a crime if a person willfully violates the provisions of Chapter 21 entitled "Reports of Currency and Foreign Transactions".

 Critical to a determination that a statement falls within the protection of the "exculpatory no" exception is a finding of possible self-incrimination. The rationale supporting this view is that a person cannot be compelled to be a witness against himself. In the case at bar, self-incrimination was clearly not implicated. Fitzgibbon could not have been held criminally liable under the subject statute had he truthfully reported the Canadian currency in his possession in excess of $5,000.00. The criminal sanction applies only if a person knowingly and willfully fails to report currency in excess of $5,000.00. Fitzgibbon could not have suffered any penalty or sanction at the hands of the Customs officials had he truthfully reported the currency in his possession. The knowing, false representation made by Fitzgibbon obstructed a statutorily mandated administrative function of a federal governmental agency. This is not a case where Fitzgibbon was "on the horns" of a dilemma between the truth and a lie. On the state of this record, it is pure speculation whether Fitzgibbon would have subjected himself to any criminal sanctions beyond those he incurred by violating the provisions of 18 U.S.C. § 1001.

## II.

In light of that which we have heretofore written, we hold that Fitzgibbon's trial counsel afforded him adequate, effective, competent representation under any recognized standard. *See: Gillihan v. Rodriquez,* 551 F.2d 1182 (10th Cir. 1977) (the "sham and mockery" test), *cert. denied,* 434 U.S. 845, 98 S.Ct. 148, 54 L.Ed.2d 111 (1977); *Dyer v. Crisp,* 613 F.2d 275 (10th Cir. 1980—En Banc) (exercise of "skill, judgment and diligence" of reasonably competent defense attorney).

WE AFFIRM.