United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 21, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 01-51108

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

VERSUS

JEFFERY A. JACKSON,

Defendant - Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas

_____

Before: DAVIS, CYNTHIA HOLCOMB HALL[*], and EMILIO M. GARZA,
Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Jeffery A. Jackson appeals his convictions for aiding and

abetting the interstate transportation of stolen jewelry, in

violation of 18 U.S.C. §§ 2 and 2314, and for conspiracy to

transport stolen jewelry in interstate commerce, in violation of

_____

[*]U.S. Circuit Judge, Ninth Circuit, sitting by designation.

18 U.S.C. §§ 371 and 2314.  On appeal, Jackson contends that the district court erred by admitting evidence of a prior state conviction for theft of watches and by admitting evidence of his state parole status.

The district court had jurisdiction over Jackson's prosecution under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291.  Because the district court abused its discretion by admitting both pieces of evidence and these errors were not harmless, we REVERSE.

**FACTS**

At approximately 5:30 a.m., on June 15, 1999, a Bailey, Banks and Biddle jewelry store in San Antonio, Texas, was burglarized.  The burglars smashed through a sliding glass door and took several valuable watches and other jewelry worth almost $700,000.  The burglary, which only lasted a few minutes, was caught on a security camera.  The video showed four masked individuals.  No identifiable fingerprints were found in the store.

Throughout the months surrounding this burglary, a number of

-2-

Bailey, Banks and Biddle stores were burglarized in similar

"smash and grab jobs" throughout California and Nevada.  The

burglaries were believed to be the work of the infamous "three-

minute gang" which may have been responsible for stealing up to

$80 million of jewelry in twelve states over a five-year-period.

The "three-minute gang," referred to as such because of their

apparent ability to get in and out of a jewelry store in less

than three minutes, was based in California.  See generally Scott

Marshall, 'Three Minute Gang' Suspects Arrested in Las Vegas,

Contra Costa Times, November 2, 1999.

Appellant, Jackson, a resident of San Antonio, was not a

member of the gang.  According to the prosecutor, Jackson was

"local talent" used only in the burglary at issue.  The core of

the gang consisted of Jackson's co-defendant, Clinton Randolph,

Clinton's brother Clayton and Jabby Lawson, the government's

principal witness at trial.  The three all resided in the Los

Angeles area.  Other members of the gang who allegedly

participated in a number of robberies included Anthony Bilberry

and Tony Whitaker, both of whom were also from California.

On the morning of June 15, 1999, several hours after the burglary, an African-American male walked into a Mailboxes, Etc. store in San Antonio and mailed two boxes to California. Chandra Young, the clerk who handled the mailing of the packages, positively identified the man as Clinton Randolph, Jackson's co-defendant. Young claims that Randolph pulled up to the store in a dark-colored sports utility vehicle and parked close to the store entrance. She saw, sitting in the front seat, one other person whom she described as a "Hispanic male" or "light-skinned black male."[1] Randolph filled out an air bill using his Los Angeles address as a return address. He sent the packages "express priority overnight" to the Los Angeles area home of a long-time friend. He picked up the package several days later.

Shortly after Randolph left, Young saw something shining close to the store entrance. She went outside to see what it was and found four expensive watches. Later, Young stopped at two pawn shops and sold one watch at each shop. When Young learned

---

[1] According to the Government's main witness, Jabby Lawson, Jackson was sitting in this seat. From the photograph of Jackson in the record, he does not appear to meet this description.

-4-

about the jewelry store break-in, she promptly notified the police and the jewelry store about the watches.

At around 9:00 p.m. on June 15, 1999, almost sixteen hours after the burglary, Jackson was pulled over for speeding in Reeves County, Texas, about 400 miles from San Antonio. He was driving on Interstate 10 westbound in a dark sports utility vehicle with California license plates. Jabby Lawson later testified that he and Clinton Randolph were in the car with Jackson when he was pulled over.

In October 1999, Clinton Randolph was arrested in Las Vegas, along with Jabby Lawson and Anthony Bilberry, another member of the gang.[2] Shortly after the arrest, Detective Eddie Gonzales interviewed Jabby Lawson in Las Vegas. In this interview, Lawson claimed that Jackson was involved in the San Antonio burglary.

### *The Trial*

---

[2] On May 22, 1999, just a few weeks before the burglary that is the subject of this appeal, Bilberry was pulled over in Texas. He stated that he was on his way to San Antonio. With him were Clinton Randolph and 51 pieces of expensive jewelry in the original manufacturer's packaging. Jackson's lawyers implied that Bilberry, not Jackson, was the fourth burglar involved in the San Antonio burglary.

Jackson and his co-defendant Clinton Randolph were not indicted for burglarizing the jewelry store. Rather, they were indicted for the federal offenses of transporting stolen goods in interstate commerce and for conspiring to commit such transporting. At trial, the prosecution connected Jackson to the burglary mainly through the testimony of Jabby Lawson. Lawson admitted that he was involved in the San Antonio burglary and claimed that the other burglars were Clinton Randolph, Clayton Randolph and Jackson. Lawson testified that after the burglary, the four burglars went to a rented room at the Hampton Inn. There, they placed the stolen jewelry in plastic sandwich bags and packed them in boxes. Then Clinton Randolph, Jackson and Lawson went to Mailboxes, Etc. Lawson claims that the three of them left San Antonio in a black Dodge sports utility vehicle later that morning. Lawson also admitted to a long history of drug use and said that during the time of the burglary, he had a five hundred dollar-a-week cocaine habit. He claimed to have received about $7,000 for his participation in the San Antonio burglary which yielded about $700,000 in stolen merchandise.

Detective Gonzales, however, testified that Lawson told him he only received $4,000 for his participation.

Lawson testified that he had been involved in eight other burglaries. Detective Gonzales, however, testified that Lawson had told him that he had been involved in twelve other burglaries. Clinton Randolph and Clayton Randolph had participated in all of these burglaries. Other members of the gang, all of whom were from the Los Angeles area, had also participated. Lawson testified that Jackson was involved only in the San Antonio burglary. Lawson said that he had met Jackson only one time before the San Antonio burglary.

FBI agent Kenneth Smith testified regarding an interview he conducted with Lawson in December 1999, two months after Detective Gonzales's first interview in Las Vegas. In this interview, Lawson acknowledged that he knew Jackson but did not implicate him in any burglary. Lawson admitted to being in Texas around June 1999 and admitted to being involved in one burglary. Yet Lawson claimed that he could not clearly remember where in Texas he had been and where he had committed the burglary. He

told Smith that he had been partying in Texas with the Randolph brothers and because he had consumed lots of drugs and alcohol, his memory regarding this time was hazy. Lawson did claim to remember, however, that he was not in San Antonio on June 15, 1999, the day of the burglary, just the contrary of Lawson's testimony in the courtroom.

In order to further implicate Jackson, the prosecution introduced into evidence records of a large number of telephone calls between Clinton Randolph's Los Angeles home and Jackson's San Antonio home during the weeks surrounding the burglary. Also, there was evidence of telephone calls being made from Randolph's Los Angeles home to Jackson's San Antonio home and to Jackson's girlfriend's San Antonio home while Jackson was in California. The prosecution also placed Jackson at several parties with Clinton Randolph in California after the burglary. Finally, the prosecution pointed out that Jackson had been pulled over on his way to California in a black sports utility vehicle with Lawson and Clinton Randolph, sixteen hours after the burglary.

Jackson's ex-wife testified that she had introduced Jackson to Clinton Randolph several years before the burglary and that Randolph had been a "family friend" of the Jacksons for a long time. Jackson's ex-wife also testified that Jackson was living with her in San Antonio during the months surrounding the burglary and at least one of the calls from Clinton Randolph's Los Angeles home to her home may have been for her.

Jackson's defense was simple and clearly laid out in his opening statement—Jackson had nothing to do with the burglary. He was not one of the men on the videotape. He similarly claimed he had nothing to do with the shipping of the bounty of the burglary to Los Angeles. Jackson claims that Jabby Lawson accused Jackson of being the fourth burglar to protect another member of Lawson's gang.

At trial, the prosecutor sought to introduce evidence of Jackson's 1994 Texas felony conviction for theft of watches. The prosecutor claimed that he offered the evidence "to demonstrate the defendant's intent to commit this offense." Jackson's attorney responded:

Mr. Jackson's state of mind isn't – we haven't contested anything about state of mind. . . . The issue here is whether or not he was there.  You know, if he was there in that burglary, no question what his state of mind is.  He's – you saw the video what those guys are doing.  There's no question what the people who are in that burglary are doing, they are stealing.

To this the prosecution responded, "they enter a not guilty plea, Your Honor, and all issues – everything is in issue, everything in the indictment. . . . Intent is always an issue."  The district court permitted the evidence to be introduced.  Jackson's attorney then stated, "Your Honor, before – I also urge under Rule 403 that the prejudicial value – outweighs the relevance.  And I request the Court to make a finding[.]"  The district court never responded to this request except by saying, "you're on the record."

Later, the prosecution called as a witness Janita Lee, an officer of the Texas Department of Justice, Parole Division.  The prosecutor's purported reason for calling Janita Lee was to introduce evidence of Jackson's parole status in order to prove

Jackson's address in San Antonio.[3]  The defense objected stating:

> Your Honor, his ex-wife has already put him there.  This is
> doing it just to get parole records in.  If the Court
> doesn't just exclude this testimony, then I would move that
> under Rule 403 you order them to redact any reference to the
> agency she was working for or the fact that he was on parole
> . . . And she just testifies that in her business records
> this is Jackson's address on these dates.

The prosecutor responded, as follows:

> She's going to have to say who she works for, Judge. Now I
> don't even care about putting the record in.  All I [want]
> her to do is to say that she does – she is employed by the
> parole division.  Obviously, she says we made a home visit
> in July 16th of '99, she's going to have to say why that
> [sic] made a home visit, but she's going to have to say we
> had him as a listed address on that date, and we made a home
> visit, according to our records.  I don't even want to put
> the record in, for that matter.  I just want her to testify
> from, just because it is a business record.

The judge overruled Jackson's objection.  Lee was called as a
witness and identified herself as a parole officer.  Despite the
prosecutor's statements that he didn't "even want to put the
record in," he immediately introduced Jackson's parole record
into evidence.  Jackson again objected and the objection was

---

[3] As noted above, Jackson's address was relevant because of
telephone calls made to Jackson's home originating from Clinton
Randolph's home in Los Angeles in the period surrounding the
burglary.

overruled.  The records contained the following notation:

OFFENSE OF RECORD: LARCENY-THEFT, OF CREDIT CA

Lee testified to Jackson's address and stated that a home visit was made on July 16, 1999.

Jackson was convicted of both offenses.  This appeal followed.

## STANDARDS OF REVIEW

We review the district court's admission of extrinsic offense evidence over a 404(b) objection under a "heightened" abuse of discretion standard.  United States v. Wisenbaker, 14 F.3d 1022, 1028 (5th Cir. 1993).  "[E]vidence in criminal trials must be 'strictly relevant to the particular offense charged.'" United States v. Hays, 872 F.2d 582, 587 (5th Cir. 1989) (quoting Williams v. New York, 337 U.S. 241, 247, 69 S. Ct. 1079, 1083, 93 L. Ed. 1337 (1949)).  If the district court abused its discretion, we do not reverse if the error was harmless.  United States v. Torres, 114 F.3d 520, 526 (5th Cir. 1997).

## DISCUSSION

In United States v. Beechum, this court, sitting en banc,

laid out the two conditions that must be met before extrinsic evidence of prior offenses, or other misconduct, can be introduced.  582 F.2d 898, 911 (5th Cir. 1979) (en banc). "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403."  Id.  Jackson argues that neither the evidence of his prior conviction nor the evidence of his parole status and accompanying parole record meets the two requirements of the Beechum test.

### *The Prior Conviction*

At trial, the prosecutor stated that he was introducing evidence regarding Jackson's prior theft conviction to show Jackson's "intent and motive in connection with this offense." Jackson was charged with two offenses.  The prosecutor, when he introduced the conviction did not make clear to which of the two offenses he was referring.  In closing argument, the prosecutor told the jury that the prior conviction could be considered "in

-13-

determining whether . . . [Jackson] act[ed] in the conspiracy knowingly and intentionally." In the government's brief in this court, it also focuses on the relevance of Jackson's prior conviction to the issue of intent in the conspiracy charge. We therefore address whether the prior conviction was relevant to prove intent on the conspiracy charge.

"Once it is determined that the extrinsic offense requires the same intent as the charged offense," the admission of the extrinsic offense "satisfies the first step" of Beechum. Id. at 913. "The similarity in intent required between the extrinsic and charged offenses only means that the defendant 'indulge himself in the same state of mind in the perpetration of both . . . offenses.'" United States v. McMahon, 592 F.2d 871, 873 (5th Cir. 1979)(quoting Beechum, 582 F.2d at 911). In McMahon, we found that the extrinsic offense of aiding and abetting an alien to elude examination "required the defendant to possess the same 'state of mind' as agreeing with others" to transport aliens. Id. Here, the extrinsic offense admitted into evidence, Jackson's conviction under Texas Penal Code section 31.03,

-14-

required that Jackson intend "to deprive the owner of property."

The conspiracy charge required that Jackson intend to agree to

transport property deprived from its owner.  The two offenses

require Jackson to "indulge himself in the same state of mind"

and therefore require the "same" intent under Beechum and

McMahon.

   At trial, Jackson never made any arguments based on intent.

His defense was clearly laid out to the jury in his opening

statement.  His defense was simply that the government had the

wrong man.  He was not involved in the burglary and the

subsequent shipping of the stolen jewelry in interstate commerce.

Jackson argues that if the jury believed Lawson's testimony that

Jackson was the fourth burglar on the videotape and that he

participated in the packing and shipping of the stolen jewelry

then the jury would inevitably believe that he intended to join a

plan to do so.

   Jackson's argument overlooks the unique nature of the intent

element in conspiracy.  In order to be found guilty of

conspiracy, the government must prove beyond a reasonable doubt

that the defendant knowingly joined a plan to further an unlawful objective—here the mailing of stolen property.  See United States v. Suarez, 608 F.2d 584, 586 (5th Cir. 1979).  In United States v. Roberts, this court expressly considered the question of whether a prior conviction is relevant to prove intent in a conspiracy case when the defendant has not raised the issue.  619 F.2d 379 (5th Cir. 1980).  The defendant, Roberts, was convicted of conspiracy to operate an illegal gambling business.  Id. at 380.  At trial, the government sought admission of a prior gambling offense.  Roberts' counsel argued that the conviction was not relevant unless the issue of intent were first affirmatively raised by the defense.  The district court rejected that argument and we affirmed.  We focused on the special nature of the element of intent in conspiracy cases:

> Charges of conspiracy involve considerations not present in other criminal prosecutions.  The offense of conspiracy requires an element of intent or knowledge which is often difficult to prove.  Because the prosecution must prove that the defendant knowingly joined a plan to commit a crime, evidence that establishes a defendant's participation in a criminal act, United States v. Suarez, 608 F.2d 584 (5th Cir. 1979), or evidence establishing his association with co-conspirators, Panci v. United States, 256 F.2d 308 (5th

-16-

Cir. 1958), may be insufficient to support the inference that the defendant voluntarily joined a conspiracy to commit a crime. Intent is particularly difficult to prove when a defendant is a passive or minor actor in a criminal drama. . . . Unequivocal evidence that a defendant committed a substantive offense may justify the inference that he intended to do so, but it does not plainly support the conclusion that he agreed and planned with others to commit the crime.

Id. at 383. The court therefore upheld the admission of the prior conviction notwithstanding the fact that the defendant had not previously made intent an issue.

The same considerations are present here. While, it is difficult to imagine that a jury would credit Jabby Lawson's testimony and nevertheless conclude that Jackson had not knowingly joined a plan to ship stolen goods, it is theoretically possible. Based on Roberts, we conclude that evidence of the prior offense was relevant to an issue other than character—specifically, Jackson's intent to join an agreement to ship stolen goods in interstate commerce. The extrinsic offense evidence therefore meets the first part of the Beechum test.

Under Beechum, however, extrinsic offense evidence that is relevant to a non-character purpose must still possess probative

value that is not substantially outweighed by its undue prejudice. Beechum, 582 F.2d at 898. "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." Old Chief v. United States, 519 U.S. 172, 184 (1997). "Probity in this context is not an absolute; its value must be determined with regard to the extent to which the defendant's unlawful intent is established by other evidence, stipulation, or inference. . . . Thus, if the Government has a strong case on the intent issue, the extrinsic offense may add little and consequently will be excluded more readily." Beechum, 582 F.2d at 914. In Roberts, the court took two considerations into account when determining the probative value of the prior offense. First, the court noted that "[t]here was little other independent evidence of intent." Roberts, 619 F.2d at 383. Second, the court observed that evidence of Roberts' prior gambling conviction was necessary to counter his claim that he was merely an ignorant participant in the operation and never knowingly agreed to participate in a gambling business. Id.

Neither consideration is present in the instant case.

First, unlike Roberts, there was other substantial evidence going to the issue of intent to enter into an unlawful agreement. Jabby Lawson testified that Jackson participated in the burglary to acquire the stolen property, went to a hotel room to help three other people package the stolen property and then drove with two others to Mailboxes Etc. to mail the stolen property in interstate commerce. If Jabby Lawson's testimony were credited, a jury would be hard-pressed to conclude that Jackson did not intend to enter into an agreement to ship stolen property. The prior conviction could not have added much to a jury's analysis of the issue except to make the jury more likely to credit Lawson's assertion that Jackson was the fourth burglar because of Jackson's prior criminal conduct. This is exactly what Rule 404 forbids.

Second, unlike the defendant in Roberts, Jackson never made a claim that he was just an ignorant participant in the burglary and shipping of the jewelry. Rather, he claimed that he was not involved at all. The nature of Jackson's defense further lessens

the probative value of the prior conviction.  See United States

v. Hernandez-Guevera, 162 F.3d 863, 872 (5th Cir. 1998)

(probative value of prior convictions for smuggling aliens was

"relatively great" when defendant "based his defense on a claim

that he was merely in the wrong place at the wrong time").

The prior conviction in this case had very little probative

value when considering the other evidence going to intent and the

nature of Jackson's defense but the potential to cause unfair

prejudice was substantial.  "'Unfair prejudice' within its

context means an undue tendency to suggest decision on an

improper basis[.]"  Advisory Committee's Notes on Fed. Rule Evid.

403.  Here, where the threshold issue was one of identity, there

was great danger that the jury would decide that Jackson was

involved in the conspiracy because of his prior criminal conduct.

This is precisely the inference Rule 404 forbids.  The

prosecutor, moreover, invited the jury to think about Jackson's

character when he referred to Jackson as "local talent."[4]  The

_____

[4] The prosecutor, when he referred to Jackson as "local
talent" in his opening statement, was explaining why an
experienced gang of Los Angeles jewelry thieves would work with

prior conviction's probative value was substantially outweighed
by its undue prejudice.  See United States v. Kirk, 528 F.2d
1057, 1060-61 (5th Cir. 1976) (When intent is not being
contested, "evidence of the defendant's commission of a crime not
charged in the indictment goes more to the inadmissible purpose
of proving that the defendant is a bad man than to the admissible
purpose of proving intent.").  Its admission therefore fails the
second part of the Beechum test.  Beechum, 582 F.2d at 911.[5]

---

Jackson, a resident of San Antonio who had never stolen with them
before.  The inference the prosecutor invited the jury to draw
was clearly that because Jackson was an experienced thief he was
more likely to be involved in this criminal activity.  Such an
inference is prohibited by Rule 404.

[5] We have noted that evidence of a "conviction for a similar
crime is more probative than prejudicial and that any prejudicial
effect may be minimized by a proper jury instruction."  United
States v. Taylor, 210 F.3d 311, 318 (5th Cir. 2000);
but see Hernandez-Guevera, 162 F.3d at 872 ("[A] close
resemblance between the extrinsic offense and the charged offense
also increases the unfair prejudice to the defendant.").  As we
noted in Roberts, and reiterate today, the inchoate crime of
conspiracy involves unique elements not present in other crimes.
Here, Jackson was accused of conspiring with three expert jewelry
thieves first to obtain almost a million dollars in stolen
jewelry in Texas and then to ship the jewelry across the country
to California.  The extrinsic offense was for a simple theft of
around ten watches worth about seven hundred dollars.  We do not
find the crimes similar enough to compel a finding that the prior

Our review of whether a district court abused its discretion is "heightened" in criminal cases. <u>Wisenbaker</u>, 14 F.3d at 1028. We recognize that a district court has wide discretion in criminal evidentiary matters. Review for abuse of discretion is not, however, "tantamount to no review at all." <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 289 (1995) (internal quotation and citation omitted). We find that, under the facts and circumstances of this case, the admission of Jackson's prior conviction was an abuse of discretion and therefore error.

### *The Parole Record*

We also conclude that the district court abused its discretion by allowing a witness to testify regarding Jackson's parole status and by admitting Jackson's un-redacted parole record into evidence. The government claims to have introduced those records to prove Jackson's address from April 16, 1999 until July 16, 1999. The government also claims that the record was relevant to show that Jackson was present at his residence on July 16, 1999. Evidence that Jackson resided at this address was

---

conviction was more probative than prejudicial.

relevant because there were a large number of telephone calls between Clinton Randolph's Los Angeles home telephone number and the telephone number corresponding to this address. The government, however, does not explain why it was relevant that Jackson was at his residence on July 16, 1999. No relevant telephone call was placed on this date. Except for one call placed on July 17, every relevant telephone call was placed before July 16, 1999. In fact, the overwhelming majority of the relevant telephone calls occurred in June during the weeks surrounding the burglary.

This case cannot be materially distinguished from United States v. Palmer, 37 F.3d 1080 (5th Cir. 1994). In Palmer, we found that the district court abused its discretion by admitting a parole certificate for the purpose of showing that the defendant fled from the police because he knew he could not legally own a firearm due to his parole status. Id. at 1085. The government had already offered evidence showing this. The court held that since the parole certificate referred to a prior conviction—not otherwise admissible into evidence—the district

court abused its discretion by admitting the parole certificate.
Id.

Here, like Palmer, there was already evidence that Jackson resided at his ex-wife's residence during the relevant time period. The prosecution called Jackson's ex-wife to testify to this fact. Furthermore, during cross-examination of Jackson's ex-wife, Jackson's counsel never questioned this fact. At no point in the trial did Jackson ever claim that he did not live at this address.

Also like Palmer, the parole record appeared to refer to a prior conviction not otherwise admissible into evidence, specifically, a conviction for credit card theft. The parole record contained the following notation:

OFFENSE OF RECORD: LARCENY-THEFT, OF CREDIT CA

The government has since explained that this notation had nothing to do with a theft of a credit card but had to do with some credit Jackson received for time served. The government asks us to look at the Pre-Sentencing Report which shows that Jackson had never been convicted for credit card theft. But the Pre-

-24-

Sentencing Report did not exist at the time of trial. We therefore cannot consider it when considering how a jury interpreted the parole record notation. A plain reading of that notation implies that Jackson had been convicted of theft of a credit card and nothing to the contrary was ever explained to the jury.

Moreover, the government offers no plausible justification for not redacting the document and for not requiring the parole officer to identify herself as just an officer of the State of Texas. At oral argument, the government claimed that because the state is required to keep track of its parolees' addresses, the document and the parole officer's testimony were more credible regarding Jackson's address. At trial, however, the government never tried to establish that the document and testimony were more credible for this reason and, as previously noted, Jackson did not challenge the fact that he resided at his ex-wife's address. The only case the government cites as authority for its position that the unredacted parole record was admissible is one where the parole certificate <u>was</u> redacted to exclude reference to

the prior conviction.  United States v. DeLeon, 170 F.3d 494, 497 (5th Cir. 1999) (redacted parole certificate without any reference to nature of crime admissible where it was necessary to prove defendant was a felon).

The minuscule probative value of the parole officer's testimony and the parole record were clearly outweighed by their potential to cause undue prejudice.  The district court therefore abused its discretion by allowing the unredacted parole record to be admitted and by allowing a witness to testify regarding Jackson's parole status.  See Palmer, 37 F.3d at 1085.

### *Harmless Error*

Given the evidence against Jackson, we cannot say that the evidentiary errors here were harmless.  The evidence against Jackson, while certainly enough to go forward with a prosecution, was not overwhelming.  This was a close case.  The government's case depended heavily on the testimony of Jabby Lawson.  Lawson had a five-hundred dollar-a-week cocaine habit at the time of the burglary at issue and told one FBI agent that he was using such large quantities of drugs and alcohol, at the time he was in

-26-

Texas, that he could not remember where in the state he was.  He told inconsistent stories about who was involved in the San Antonio burglary, whether he himself was involved in the burglary at all, the amount of money he received for participating in the burglaries, and the total number of burglaries in which he was involved.  Although there was some evidence linking Jackson to Clinton Randolph, such evidence could not have sustained a conviction without the testimony of Lawson. The erroneously admitted evidence regarding Jackson's prior conviction and parole status could have been what convinced the jury to believe Jabby Lawson's claim that Jackson was involved in the shipping of stolen jewelry.  We therefore cannot say that the errors were harmless.

## CONCLUSION

Jeffery A. Jackson's convictions, under 18 U.S.C. §§ 2, 371 and 2314, are **REVERSED**.  The sentences imposed pursuant to those convictions are **VACATED**.  We **REMAND** for retrial, or other proceedings, consistent with this opinion.

-27-