**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 5, 2011

No. 10-30722

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MERLIN MIRELES,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:09-CR-56-1

Before WIENER, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:[*]

Merlin Mireles appeals his conviction for transporting illegal aliens under 8 U.S.C. § 1324(a)(1)(A)(ii) and harboring illegal aliens under 8 U.S.C. § 1324(a)(1)(A)(iii) and (v)(II). We AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30722

I.    FACTS

In 2001, Mireles was hired as a United States Customs and Border Protection ("CBP") Officer[1] and assigned to the port of entry at Progreso, Texas. Under CBP regulations, officers are not allowed to date illegal aliens. The CBP officers' handbook further warns officers that they should avoid any association that might obligate or appear to obligate them to an alien in any way.

In 2002, while waiting to obtain permanent housing in Progreso, Mireles lived at the Azteca Hotel, where he met Maribel Camargo-Garcia, a housekeeper who worked and lived at the hotel. Camargo-Garcia was in the country illegally, having entered in 1997 with her husband, who abused her and was later deported. In early 2002, Mireles and Camargo-Garcia became romantically involved. Four or five months later, Camargo-Garcia and her two children, Johana and Jonathan, moved in with Mireles at his house in Weslaco, Texas. In 2004, Mireles moved Camargo-Garcia and her children to a house that his mother owned in Metairie, Louisiana. Camargo-Garcia lived there until early 2005, when Mireles and his mother evicted her after she started seeing another man.

In February 2009, Mireles was charged with: (1) one count of transporting illegal aliens (8 U.S.C. § 1324(a)(1)(A)(ii)); (2) one count of harboring illegal aliens (8 U.S.C. §§ 1324(a)(1)(A)(iii) and (v)(II)); and (3) one count of conspiracy to harbor illegal aliens (8 U.S.C. § 1324(a)(1)(A)(v)(I)). Mireles's case went to trial, and on March 9, 2010, a jury convicted him of the first two counts but acquitted him of the conspiracy charge. The district court sentenced him to concurrent terms of eighteen months in prison, followed by three years of supervised release. He filed a timely notice of appeal.

---

[1] At the time Mireles was hired, the agency was called the Immigration and Naturalization Service ("INS"). In 2003, the INS was abolished and the CBP was created in its place as part of the Department of Homeland Security.

A.     Trial Testimony

Mireles's trial centered primarily around whether he knew of Camargo-Garcia's illegal status. The Government's case on this point relied almost exclusively on Camargo-Garcia's testimony. Camargo-Garcia testified that she never had any immigration papers, nor did her children. She did, however, have a Texas identification card. Mireles did not ask if she had any papers and he learned that she was in the United States illegally during a date, when he wanted to have dinner in Mexico and Camargo-Garcia told him that she could not go because she would be unable to return to the United States. Mireles said that the fact that she did not have papers was a problem for him. At some point after she moved in with Mireles in Weslaco, Mireles told her that she should get an apartment because he was afraid his coworkers might find out that he was living with an illegal alien. In addition, Mireles never brought his friends to the house, although Mireles and Camargo-Garcia did go out in public together.

Camargo-Garcia also attested that Mireles drove her and her children to his mother's home in Metairie on two occasions in 2004. Both times, Mireles wore his CBP officer uniform, and an immigration officer stopped them at an immigration checkpoint. Camargo-Garcia and her children permanently moved to Metairie on the second trip. On this trip, the officer at the checkpoint asked her if she was "a resident or something like that." Mireles told her to say "yes," and she did. The move to Metairie was Mireles's idea. When Camargo-Garcia asked Mireles why he moved her from Texas to Louisiana, he said that he was afraid his friends would come to the house, which could cause him problems due to her illegal status. When she told Mireles that she did not want to move, he convinced her it would be better for her son to live in Louisiana.

Camargo-Garcia admitted that the Government gave her a special benefit parole to stay in the country to testify. While on parole, she became engaged to a permanent resident and applied for permanent residency. The Government did

not promise her any assistance in obtaining legal residency as a result of her testimony.

Mireles's defense consisted entirely of his own testimony. He testified that he met Camargo-Garcia through his mother, who had met Camargo-Garcia at the hotel. After learning that Camargo-Garcia was being beaten and abused on a regular basis, Mireles's mother wanted Camargo-Garcia to move in with them in Progreso. Mireles agreed, so long as Camargo-Garcia had documents showing she was in the United States legally. Camargo-Garcia provided him with: (1) U.S. birth certificates for her children; (2) a Texas state identification card; (3) a resident alien card for Maribel Garcia; and (4) a Social Security card issued to Maribel Garcia. She showed her resident alien card to a guard when they went to the Naval Air Station museum during a trip to Florida. Camargo-Garcia also showed Mireles four police reports indicating that her husband had beaten her and that she had protective orders against her husband. Mireles took Camargo-Garcia's willingness to speak to the police to show that she was not an illegal alien. Mireles frequently went out with Camargo-Garcia and his coworkers, and he did not try to hide her from his coworkers. He did not invite his coworkers to come over to his house because he was ashamed of the house. He never suspected that Camargo-Garcia was an illegal alien.

Mireles also testified that he wanted Camargo-Garcia and her children to move to Metairie because he thought Jonathan—who is hearing impaired—would receive better schooling at the School for the Deaf in Baton Rouge than he was receiving in Texas. Mireles had a difficult time convincing Camargo-Garcia that the school in Baton Rouge (a boarding school) was the best thing for Jonathan, however, and Jonathan did not start attending that school until after Mireles's mother evicted Camargo-Garcia and the children from her house.

No. 10-30722

B.     Alleged 404(b) Testimony

At trial, the Government sought to introduce the testimony of several of Mireles's coworkers. Mireles objected, and the Government stated that the testimony was relevant:

> because [Mireles's Attorney had] argued to the jury in his opening statement that it didn't make sense, and that's a quote, for him to have harbored an illegal, but when you look at his work record, he violated on repeated occasions, like, the code of conduct. There was an instance where he actually solicited, asked for a date of a woman coming across the border.
> Now, I think he opened the door to that by suggesting that this guy, that he had no reason, but he continually, he was continually late. He was caught sleeping. This guy just simply, he didn't care about his job, so it made perfect, it made perfect sense for him to do this because there are instances where he didn't, he didn't honor his code. He didn't honor the regulations.

The district court asked the Government if it was "404(b)" evidence, which the Government denied. Mireles reiterated his objection, stating that the proffered evidence was "character assassination. That's all it is. It's just character evidence." The district court overruled Mireles's objection as to the majority of the Government's proffered evidence.

The Government then presented the testimony of Progreso CBP Port Director, Robert Vargas. Relevant to this appeal, Vargas testified that he was not satisfied with Mireles's work as a CBP officer and that he had recommended to his supervisor that the CBP terminate Mireles. Vargas did not testify that Mireles fell asleep or otherwise broke CBP regulations.

The Government also presented the testimony of Mireles's supervisor, Jorge Galvan. Galvan testified that Mireles had never mentioned Camargo-Garcia to him but that Mireles had stated that he was in the process of applying for a K-1 visa for his girlfriend, Paola Quinones, to enter the United States so that he could marry her. The Government offered the K-1 visa application into

No. 10-30722

evidence, which showed that Mireles applied for the visa shortly after his mother evicted Camargo-Garcia from her home in Metairie.

The Government also presented testimony by the chief CBP officer at the port, Walter Weaver. Weaver testified that he witnessed Mireles flirting with an Asian woman crossing the border through the port. Weaver summoned Mireles into his office and told him that it was inappropriate behavior.

## II. STANDARD OF REVIEW

Generally, this court reviews a trial court's decision to admit evidence for abuse of discretion. *United States v. Williams*, 620 F.3d 483, 488 (5th Cir. 2010). The abuse of discretion standard is heightened where character evidence is admitted under Rule 404(b)[2] because "[e]vidence in criminal trials must be strictly relevant to the particular offense charged." *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003) (internal quotation marks omitted). "If the district court abused its discretion, we do not reverse if the error was harmless." *Id.*

> A challenge to the sufficiency of evidence following a proper motion for acquittal is reviewed by this court de novo. In reviewing challenges to the sufficiency of the evidence in a criminal case, the evidence is viewed in the light most favorable to the jury verdict. All credibility determinations and reasonable inferences from the evidence are to be resolved in favor of the jury verdict. Moreover, a court must affirm if a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt.

*United States v. Winkler*, 639 F.3d 692, 696 (5th Cir. 2011) (internal citations and quotation marks omitted).

---

[2] Federal Rule of Evidence 404(b) states:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

No. 10-30722

## III.    DISCUSSION

Mireles raises two arguments on appeal.[3] He first argues that the district court erred in allowing three specific pieces of extrinsic evidence under Rule 404(b): (1) evidence that Mireles applied for a K-1 visa for Quinones to enter the United States to marry him after his mother evicted Camargo-Garcia ("K-1 Evidence"); (2) testimony that a supervisor considered Mireles's first-year job performance to be subpar ("Job Performance Testimony"); and (3) testimony that Mireles had improperly flirted with an Asian woman during an inspection, in violation of CBP policy ("Flirting Testimony").[4] He also argues that the evidence was insufficient to support his convictions.

### A.    404(b) Evidence

As an initial matter, the Government disputes whether Mireles properly preserved this issue for appellate review. The Government argues that Mireles did not raise a Rule 404(b) objection; instead, it argues that Mireles only objected to "character evidence" under Rule 404(a). It therefore argues that this court should review for plain error. *See Williams*, 620 F.2d at 488-89. We disagree.  To preserve an evidentiary error for review, the movant must make "a timely objection or motion to strike . . . stating the specific ground of objection, if the specific ground was not apparent from the context." FED. R. EVID. 103(a)(1). For two reasons, it was apparent from the context that Mireles's attorney was making a Rule 404(b) objection. First, the district court had specifically asked

---

[3] Mireles also argues that the jury instruction erroneously failed to require a finding of intent to facilitate an alien's continued illegal presence. He acknowledges that Fifth Circuit precedent forecloses his third point of error and raises this issue solely for the purposes of further review. *See United States v. Shum*, 496 F.3d 390, 391-92 (5th Cir. 2007); *United States v. De Jesus-Batres*, 410 F.3d 154, 161-62 (5th Cir. 2005).

[4] Mireles also argues that the district court erred in admitting the evidence because the Government did not provide advance notice of the alleged 404(b) evidence prior to trial. But Rule 404(b) only requires notice "upon request by the accused." FED. R. EVID. 404(b). Mireles did not request prior notice of extrinsic character evidence, and therefore the Government was not obligated to provide notice.

No. 10-30722

the Government if it was attempting to introduce 404(b) evidence. Second, Mireles's attorney began the colloquy with his concern about "incidents that occurred at work, not crimes that he's ever been convicted of." These statements clearly show that Mireles's attorney was objecting to "other acts" character evidence under Rule 404(b). Mireles properly preserved his objection, and we review the district court's admission of the alleged 404(b) evidence for abuse of discretion.[5]

### 1.    K-1 Evidence

Mireles argues that the K-1 Evidence was extrinsic evidence admitted to prove character in violation of Rule 404(b). Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Without deciding whether the district court erred in admitting the K-1 testimony, we conclude that any error was harmless. The admission of the K-1 evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Wright*, 634 F.3d 770 (5th Cir. 2011) (internal quotation marks admitted). Given the other evidence offered to prove Mireles's knowledge, it is not substantially likely that the admission of the K-1 evidence increased the risk

---

[5] The Government separately argues that Mireles failed to preserve his arguments against the K-1 Evidence because he failed to lodge a contemporaneous objection. But Mireles's attorney and the Government specifically referred to the K-1 Evidence during the colloquy following Mireles's attorney's first objection. Because "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence , . . . a party need not renew an objection or offer of proof to preserve a claim of error for appeal," Mireles was not required to re-object to the evidence after the district court allowed the Government to proceed following the colloquy. FED. R. EVID. 103(a).

The Government also argues that the K-1 Evidence and the Job Performance Testimony were intrinsic background evidence not subject to Rule 404(b). "Evidence of an act is intrinsic when it and evidence of the crime charged are inextricably intertwined, or both acts are part of a single criminal episode, or it was a necessary preliminary to the crime charged." *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007) (citing *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005)). We believe it obvious that Mireles's application for *another woman* to enter the United States and his job performance over the course of a year are not "inextricably intertwined" or "necessary preliminar[ies]" to the charged crimes. *Id.*

of the jury convicting Mireles for some improper reason, such as philandering, rather than on the basis of the evidence of his knowledge that Camargo-Garcia was an illegal alien. Therefore, we find any potential error in admitting the K-1 evidence was harmless.

### 2.    Job Performance Testimony

Mireles also argues that the Job Performance Testimony was improper 404(b) character evidence. Vargas, the CBP Port Director, testified that Mireles "was not doing the work that, that was producing with the same grade level officers," that Mireles "was doing the minimum work," and that Vargas recommended that the CBP terminate Mireles. Vargas did *not* testify that Mireles broke CBP rules or that he performed any illegal activities while at work. Vargas's testimony that Mireles was an underperforming employee, without more, is not evidence of Mireles's character for rule-breaking. It is however, evidence of the lack of importance he placed on his job and serves to rebut his counsel's prior assertion that Mireles valued his job too much to risk losing it by harboring an illegal alien. Therefore, the testimony served a valid purpose and the district court did not abuse its discretion in overruling Mireles's Rule 404(b) objection to the Job Performance Testimony.

### 3.    Flirting Testimony

Mireles finally argues that the Flirting Testimony was irrelevant character evidence because it "rests on the impermissible inference that previous misconduct demonstrates that [Mireles] is the kind of person who does not respect rules and therefore is likely to break them again in the future." He also argues that the testimony was highly prejudicial because it "laid the groundwork for the government to tar [Mireles] as a womanizer who abused the public trust to improve his sex life." The Government argues that the Flirting Testimony was relevant evidence that Mireles disregarded the immigration process "when it

came to Camargo-Garcia, contrary to his opening statement defense" that it "didn't make sense" for a trained immigration officer do so.

In *United States v. Beechum*,582 F.2d 898, 911 (5th Cir. 1978), this court established a two-prong test for determining if extrinsic evidence of a defendant's prior acts is admissible under Rule 404(b). "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character." *Id.* The test for relevancy at this step is identical to the test under Rule 401. *Id.*[6] Extrinsic evidence can be relevant to "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). "Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." *Beechum*, 582 F.2d at 911.

We first address whether the Flirting Testimony was relevant to anything besides character. "It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." *United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) (citing cases). In *United States v. Casto*, this court held that the defense had "opened the door" for discussion of a guilty plea by referring to a co-defendant's credibility during opening statements. 889 F.2d 562, 567 (5th Cir. 1989). This court held that, "[i]n this situation, it is the prosecution's privilege to defuse potential attacks on his witness's credibility during direct examination." *Id.*

During opening statements, Mireles's attorney stated:

It really doesn't make sense, does it, that a trained immigration officer would do the things that [the Government] is going to try to prove to you that Mr. Mireles did. If he's a trained immigration

---

[6] Under Rule 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

officer, he knows that he's not allowed to cohabit with an illegal alien. He can date an alien. He can date a legal alien. . . .

We read this statement as a lack-of-motive argument: Mireles did not know about Carmargo-Garcia's illegal status because (1) he dated her, (2) he knew that dating illegal aliens was against CBP regulations, and (3) he would not break CBP regulations. Although Mireles's attorney did not say so explicitly, the implication is that Mireles would not break CBP regulations because he would risk losing his job by doing so. Mireles's statement, therefore, "opened the door" to admission of evidence concerning his motivation to avoid breaking CBP regulations.[7] The Flirting Testimony directly refuted this inference—Mireles was willing to risk his job by breaking CBP regulations with Camargo-Garcia because he had already risked his job by breaking CBP regulations in the past. The Government gave this exact reason for admitting the evidence, telling the district court during a bench conference that Mireles "opened the door . . . by suggesting that this guy, that he had no reason, but . . . . [t]his guy just simply, he didn't care about his job, so it made perfect sense . . . for him to do this because there are instances where . . . . [h]e didn't honor the regulations." The Flirting Testimony was therefore relevant to something other than Mireles's alleged character for breaking rules.

Because the Flirting Testimony was relevant to something besides Mireles's alleged character for rule-breaking, we next address whether the

---

[7] On appeal, Mireles argues that "[i]n effect, the government tries to paint the opening statement as a good-character argument – Merlin is not the kind of person who would disregard his training – so that it can justify its own use of bad character evidence: the flirtation with an entrant." We recognize that an alternate motivation for not wanting to break CBP regulations is a CBP officer's good character for following rules. And, although a party may expand the realm of relevant non-character evidence by "opening the door," Rule 404(a) only allows the Government to present character evidence to rebut *evidence* of an accused's character. FED. R. EVID. 404(a). Under a plain reading of Rule 404(a), the Government could not present bad character evidence to rebut a potential good character argument during opening statement because argument by an attorney during opening statements is not evidence. *See Foradori v. Harris*, 523 F.3d 477, 513 (5th Cir. 2008).

prejudicial nature of the testimony outweighs its probative value. "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997). Here, the Government presented no alternative evidence showing that Mireles had previously broken CBP rules and regulations. Thus, the Flirting Testimony had relatively high probative value.

Finally, although the Flirting Testimony had the potential to cause unfair prejudice by painting Mireles in an unfavorable light, we conclude that the district court did not abuse its discretion in allowing the Government to present the testimony. This court stated in *Beechum* that prejudice is "likely to be less when the extrinsic activity is not of a criminal nature." *Beechum*, 582 F.2d at 915 n.20. "[T]he discretionary policy against undue prejudice would seem to require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Id.* The fact that Mireles had flirted with one woman in violation of CBP procedures is not the type of information that poses a risk that the jury would be "excited to irrational behavior." Although the Government could use the testimony in conjunction with the K-1 Evidence to paint Mireles as a womanizer,[8] this potential prejudice did not "substantially outweigh," and was not "disproportionate" to, the probative value of the evidence such that the district court's decision to admit the evidence was an abuse of discretion. We

---

[8] The Government did exactly this, stating that Mireles took his CBP oath seriously "except when it came to his sex life," that he abandoned Camargo-Garcia "in Metairie, and he's hitting on a woman at the border back in Progreso," and that he got Camargo-Garcia and her kids "out of that house . . . to make room for Paola." We consider these remarks to be entirely inappropriate.

decline to reverse Mireles's conviction based on the admission of the Flirting Testimony.

B.    Sufficiency of the Evidence

1.    Mireles's conviction for transporting illegal aliens

Mireles argues that the evidence was insufficient to support his conviction for transporting illegal aliens under 8 U.S.C. § 1324(a)(1)(A)(ii). In order to convict Mireles, "the jury had to find beyond a reasonable doubt that (1) an alien entered or remained in the United States in violation of the law, (2) [Mireles] transported the alien within the United States with intent to further the alien's unlawful presence, and (3) [Mireles] knew or recklessly disregarded the fact that the alien was in the country in violation of the law." *United States v. Nolasco-Rosas*, 286 F.3d 762, 765 (5th Cir. 2002).

Our review of the record shows that there was sufficient evidence for the jury to find all of these elements beyond a reasonable doubt. The parties did not dispute that Camargo-Garcia and her children were illegal aliens—fulfilling the first element of the offense. Additionally, Camargo-Garcia testified that Mireles told her that he had moved her to Metairie because he "had concerns that his friends would come to the house" and that he could "have problems" with her illegal status. The jury could have believed Camargo-Garcia's testimony and concluded that Mireles moved Camargo-Garcia to shield her presence from detection by his coworkers—fulfilling the second element. Finally Camargo-Garcia explicitly testified that Mireles knew that she was an illegal alien. The jury could have credited Camargo-Garcia's testimony over Mireles's testimony that he did not know her illegal status—fulfilling the third element. Viewing the evidence in the light most favorable to the verdict, we conclude that the Government presented sufficient evidence to support Mireles's conviction under 8 U.S.C. § 1324(a)(1)(A)(ii).

No. 10-30722

2.    Mireles's conviction for harboring illegal aliens

Mireles likewise argues that the evidence did not support his conviction for harboring illegal aliens under 8 U.S.C. §§ 1324 (a) (1)(A) (iii) and (v)(II). To convict Mireles of concealing, harboring, or shielding aliens, the Government had to establish the following four elements: "(1) the alien entered or remained in the United States in violation of the law, (2) [Mireles] concealed, harbored or sheltered the alien in the United States, (3) [Mireles] knew or recklessly disregarded that the alien entered or remained in the United States in violation of the law, and (4) [Mireles's] conduct tended to substantially facilitate the alien remaining in the United States illegally." *United States v. Shum*, 496 F.3d 390, 391-92 (5th Cir. 2007). To "'substantially facilitate' means to make an alien's illegal presence in the United States substantially 'easier or less difficult.'" *Id.* at 392 (citation omitted).

Our review of the record also shows that there was sufficient evidence for the jury to find all of these elements beyond a reasonable doubt. As discussed above, the evidence was sufficient to support the jury's finding that Camargo-Garcia and her children were illegal and that Mireles knew that they were illegal—fulfilling the first and third elements. By moving Camargo-Garcia to Metairie, Mireles reduced the possibility that his coworkers would inadvertently discover Camargo-Garcia. He also provided her with a place to live, both in Texas and in Louisiana. Finally, Camargo-Garcia testified that he told her to lie to an immigration officer about her legal status. Looking at the evidence in the light most favorable to the jury verdict, the evidence supported the jury's conclusion that Mireles concealed Camargo-Garcia from his coworkers and that his concealment made it easier for Camargo-Garcia to stay in the United States—fulfilling the second and fourth elements. *See United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1072 (5th Cir. 1982) (warning illegal aliens of the presence of immigration officials constitutes concealing or shielding from

14

detection). The Government presented sufficient evidence to support Mireles's conviction under 8 U.S.C. § 1324(a)(1)(A)(iii).

## IV.    CONCLUSION

For the foregoing reasons, we AFFIRM Mireles's conviction.