# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-30773

United States Court of Appeals
Fif h Circuit

**FILED**
August 7, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

NOE JUAREZ,

Defendant–Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, PRADO, and SOUTHWICK, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Houston police officer Noe Juarez was charged and convicted of two counts related to his participation in a drug trafficking conspiracy. On appeal, he contends the district court erred by (1) admitting extrinsic evidence under Federal Rule of Evidence 404(b), (2) instructing the jury on deliberate ignorance, and (3) applying a sentencing enhancement based on Juarez's sale of body armor to his coconspirators. We AFFIRM Juarez's conviction because the district court did not abuse its discretion in admitting the 404(b) evidence or by giving the instruction. However, because the district court misapplied the body-armor provision of the sentencing guidelines and this error was not harmless, we VACATE Juarez's sentence and REMAND for resentencing.

No. 16-30773

# I. BACKGROUND

Noe Juarez was a twenty-year veteran of the Houston Police Department. In April 2015, he was charged with (1) conspiring to distribute five kilograms or more of cocaine hydrochloride in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and (2) conspiring to possess firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(o). Juarez allegedly used his position as a police officer to assist the Grimaldo drug organization—an arm of the Los Zetas drug cartel—in its efforts to traffic drugs from Mexico to the United States. Twenty witnesses testified at trial during the Government's case-in-chief, including three members of the Grimaldo organization: Sergio Grimaldo, one of the leaders; Aldo Perez, a courier who delivered drugs from Houston to Houma, Louisiana; and Sabino Duarte, another courier. The Government sought to prove that Juarez assisted the Grimaldos' drug trafficking business by providing its members with firearms, body armor, police scanners, and vehicles, as well as by helping the conspirators evade detection by law enforcement. Juarez did not testify, but his defense was that he did not intend to join the conspiracy because he did not know he was working with drug dealers. He argued through counsel that he believed the Grimaldos were "legitimate businessmen."

The district court allowed the Government to introduce evidence of Juarez's involvement in two prior, uncharged conspiracies, referred to by the parties as the "Gallegos conspiracy" and the "Casteneda conspiracy." The Government contended that Juarez provided "virtually the same type of assistance" to these conspiracies as he did to the Grimaldo conspiracy. Particularly significant to the Government's case was an audio and video recording of Juarez speaking to an FBI informant. During these discussions, Juarez offered to sell the informant weapons and body armor to ship to drug dealers in Mexico, gave the informant advice on avoiding detection by law

2

enforcement, and instructed her to delete and replace the serial numbers on the firearms she was provided.

The jury convicted Juarez on both counts. The district court applied a sentencing enhancement pursuant to U.S.S.G. § 3B1.5 predicated on Juarez's sale of bulletproof police vests to the Grimaldos. The enhancement resulted in a Guidelines range of 292–365 months' imprisonment. The district court sentenced Juarez to 365 months on Count 1 and 240 months on Count 2, to be served concurrently. Juarez timely appealed.

## II. DISCUSSION

### A.     Admission of Extrinsic Evidence

Juarez first argues that the district court erred in admitting extrinsic evidence of his involvement in the uncharged conspiracies. Under Federal Rule of Evidence 404(b), evidence of a "crime, wrong, or other act is not admissible to prove a person's character"; however, such evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2). This Court's two-step test for admissibility requires a determination that (1) "the extrinsic offense evidence is relevant to an issue other than the defendant's character" and (2) the evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice . . . and meet[s] the other requirements of [Federal Rule of Evidence] 403." *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc). Juarez does not contest that the extrinsic evidence was relevant under step one; rather, he contends that the district court "incorrectly conclud[ed] that the prejudice arising from this evidence did not substantially outweigh its probative value" under the second prong. We consider several factors when weighing the evidence under Rule 403: "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount

3

of time separating the two offenses, and (4) the court's limiting instructions." *United States v. Smith*, 804 F.3d 724, 736 (5th Cir. 2015) (quoting *United States v. Kinchen*, 729 F.3d 466, 473 (5th Cir. 2013)). In addition, we consider the overall prejudicial effect of the extrinsic evidence. *See Beechum*, 582 F.2d at 917. We address each factor in turn.

### 1. The Government's Need for Extrinsic Evidence

Extrinsic evidence has high probative value when intent is the key issue at trial. *See, e.g.*, *United States v. Rojas*, 812 F.3d 382, 405 (5th Cir. 2016); *Smith*, 804 F.3d at 736; *Beechum*, 582 F.2d at 914–15. This is particularly true when the evidence is "necessary to counter [a defendant's] claim that he was merely an ignorant participant in the operation and never knowingly agreed to participate in a[n] [illegal] business." *United States v. Jackson*, 339 F.3d 349, 356 (5th Cir. 2003). We also consider whether there was other evidence of intent that might have made extrinsic evidence unnecessary. *Id.* For example, in *United States v. Hernandez-Guevara*, 162 F.3d 863 (5th Cir. 1998), this Court found that the district court did not abuse its discretion in allowing references at trial to the defendant's past misconduct, noting that the probative value of such evidence was "relatively great" because the defendant "based his defense on a claim that he was merely in the wrong place at the wrong time and had been framed." *Id.* at 872. The probative value was further heightened by the fact that the other evidence "shed little light on [the defendant's] intent and whether his alleged crime was the result of mistake or accident." *Id.*

Here, the district court found that the Government's need for the extrinsic evidence weighed in favor of admission. The district court explained that "[b]y pleading not guilty, Juarez placed his criminal intent directly at

issue."[1] Moreover, because Juarez "denied knowing that any of his alleged cohorts were drug dealers," evidence of his prior activity helped "eliminate alternative explanations, such as ignorance of drugs and the drug trade." *See United States v. Thomas*, 294 F. App'x 124, 130 (5th Cir. 2008). At trial, there was some independent evidence of Juarez's intent; for example, Sergio Grimaldo testified that Juarez knew Grimaldo was "moving cocaine" and "knew what [Grimaldo] was doing." But the extrinsic evidence was nonetheless highly persuasive in corroborating that testimony and refuting Juarez's defense that he was an ignorant participant. Accordingly, the district court did not err in its determination that this factor weighs in favor of admission.

### 2. *Similarity Between the Extrinsic and Charged Offenses*

Similarity between the prior and charged offenses increases both the probative value and prejudicial effect of extrinsic evidence. *See Hernandez-Guevara*, 162 F.3d at 872. Despite the prejudicial effect of similar prior bad act evidence, however, this Court has maintained that "it does not follow that similarity *requires* exclusion of the evidence." *Kinchen*, 729 F.3d at 473; *see also Cockrell*, 587 F.3d at 679–80 (allowing admission of defendant's prior drug conviction even though it was for "substantially the same crime charged"). In *Beechum*, we reasoned that if the offenses are mostly dissimilar or only share one element, "the extrinsic offense may have little probative value to counterbalance the inherent prejudice of this type of evidence." 582 F.2d at 915. Thus, "the probative value of the extrinsic offense correlates positively with its likeness to the offense charged." *Id.* As with the overall balancing act under Rule 403, the district court must assess the similarity of the offenses

---

[1] "Where, as here, a defendant enters a plea of not guilty in a conspiracy case," intent is at issue and "the first prong of the *Beechum* test is satisfied." *United States v. Cockrell*, 587 F.3d 674, 679 (5th Cir. 2009).

and weigh enhanced probative value against the prejudice that almost certainly results when evidence of prior misconduct is admitted. *Id.*

The district court recognized that similarity "can cut both ways." In the charged conspiracy, Juarez assisted the Grimaldos by purchasing vehicles for their use, selling them firearms and body armor, and assisting them in evading detection by law enforcement. The evidence presented regarding the uncharged conspiracies suggested that Juarez's participation in the Gallegos and Casteneda conspiracies was essentially identical, a fact which was undoubtedly prejudicial to Juarez. But given that the probative value of the extrinsic offense correlates positively with its likeness to the charged offense, the similarity factor also weighs in favor of admission.

### 3. Amount of Time Separating the Offenses

Probative value is "augmented by [a] lack of temporal remoteness" between the offenses. *Id.* at 971. This Court has found that evidence of misconduct committed less than three years prior to the charged crime is admissible, while suggesting that ten years may be too remote. *See United States v. Adair*, 436 F.3d 520, 527 (5th Cir. 2006); *United States v. Grimes*, 244 F.3d 375, 384–85 (5th Cir. 2001). It is even more probative when the offenses occur "concurrently." *Smith*, 804 F.3d at 736.

The district court noted that "Juarez allegedly participated in the charged offense, as well as the other drug conspiracies, at roughly the same time." His participation in the charged conspiracy to distribute drugs began "at a time unknown until in or about the year 2012," and the conspiracy to possess firearms began "on a date unknown but prior to July 17, 2013." The district court found that Juarez's alleged participation in the Gallegos conspiracy ended at most eight or nine years before the charged offense. With regard to the Casteneda conspiracy, it appears that Juarez's conduct took place

between 2011 and 2012. Accordingly, the closeness in time between the extrinsic and charged offenses weighs in favor of admission.

### 4. *Limiting Instructions*

While limiting instructions cannot eliminate prejudicial effect, they can to a certain extent "allay . . . the undue prejudice engendered by" extrinsic evidence. *Beechum*, 582 F.2d at 917. When the court gives "extensive and immediate limiting instructions following the admission of prior offense testimony," that helps to counteract the prejudicial effect of 404(b) evidence. *Cockrell*, 587 F.3d at 680; *see also Smith*, 804 F.3d at 736; *United States v. McCall*, 553 F.3d 821, 829 (5th Cir. 2008). The district court took several measures intended to allay undue prejudice. First, the district court instructed the jury more than once regarding the limited purpose of the 404(b) evidence, both before the Government began its presentation of that evidence, and during the final jury instructions. Second, recognizing that the volume of extrinsic evidence had the potential to overwhelm the proceedings, the district court allowed the Government only one day to present evidence of uncharged conspiracies. Separating the "case-in-chief" and extrinsic evidence was intended to minimize confusion by the jury. Thus, the district court took preventative measures aimed at reducing the prejudicial effect of the 404(b) evidence.

### 5. *Overall Prejudicial Effect*

Even if all four factors weigh in the Government's favor, we must still evaluate the district court's decision under a "commonsense assessment of all the circumstances surrounding the extrinsic offense." *Beechum*, 582 F.2d at 914. Such circumstances generally include the nature of the prior offense and the likelihood that the 404(b) evidence would confuse or incite the jury. This Court explained in *Beechum* that the "remaining considerations under [R]ule 403 [did] not alter [its] conclusion as to the admissibility of the extrinsic

evidence," noting that the prior offense was "not of a heinous nature" and "would hardly incite the jury to irrational decision by its force on human emotion." *Id.* at 917. Similarly, in *Hernandez-Guevara*, the Court observed that the "prior misconduct lacked the hallmarks of highly prejudicial evidence. They were not violent acts, nor were they greater in magnitude than the crimes for which [the defendant] was on trial, nor did they occupy more of the jury's time than the evidence of the charged offenses." 162 F.3d at 872 (citation omitted).

The crux of Juarez's argument is that the district court's efforts were insufficient in light of how the evidence was presented at trial. According to Juarez, the extrinsic evidence "overwhelmed the proceedings." As he points out, the Government's opening statement characterized the extrinsic evidence as "special evidence" that would be "particularly important" because it captured "Noe Juarez on tape, on video and audiotape." The Government also highlighted that Juarez did "[a]lmost the same thing" in the prior conspiracies and characterized him as "an opportunist who will join drug and gun conspiracies to benefit himself." At the same time, however, the Government also explained that the extrinsic evidence was special because it was only to be used for the purpose of proving Juarez's intent and reminded the jury that the judge would give them corresponding "special instructions" regarding that evidence.

Given the similarity of the offenses and the nature of the evidence, there was a definite risk that the jury would place undue weight on the extrinsic evidence and convict Juarez based on his involvement in the uncharged conspiracies. The extrinsic offenses were not of a "heinous nature," but they nonetheless involved audio and video evidence of Juarez offering to sell firearms to ship to drug dealers in Mexico and providing advice on how to evade detection by law enforcement—evidence which was likely more concrete for the jury than witness testimony. Moreover, the Government's statement that this

evidence proved Juarez was "an opportunist who will join drug and gun conspiracies to benefit himself" was highly prejudicial because it characterized Juarez as the kind of person who commits criminal acts—the thing Rule 404(b) prohibits. A similar situation arose in *Jackson*, where we found it unduly prejudicial for the prosecutor to refer to the defendant, who had been recruited for a burglary, as "local talent" because it "invited the jury to think about [the defendant's] character." 339 F.3d at 356. The "opportunist" statement is analogous. And although the district court limited the presentation of 404(b) evidence to one day of trial, the jury nevertheless heard from eight witnesses who testified regarding Juarez's involvement in the prior conspiracies.

Despite the prejudicial effect, however, we cannot say that the district court's weighing of the evidence was an abuse of discretion. The Government's need for the evidence, the similarity of the offenses, and the closeness in time between the charged and uncharged conspiracies made the extrinsic evidence highly probative in proving the key issue at trial. The district court also gave limiting instructions and structured the trial such that the jury would not get confused about the purpose of the evidence. The majority of the trial was spent on the charged conspiracy and the extrinsic evidence did not take up an undue amount of time. Furthermore, Juarez's conduct was not of a heinous or violent nature. While highly persuasive, the extrinsic evidence was unlikely to incite the jury to convict purely based on its emotional impact. Accordingly, we find that the district court did not abuse its discretion in admitting extrinsic evidence of the prior conspiracies under Rule 404(b).

## B.    Deliberate Ignorance Instruction

Juarez next argues that the district court erred by giving the jury a deliberate ignorance instruction, allowing the jury to conclude that Juarez knowingly joined the conspiracy if it found that Juarez "deliberately closed his

eyes to what would otherwise have been obvious to him."[2] Jury instructions are reviewed for abuse of discretion; we determine "whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Cessa*, 785 F.3d 165, 185 (5th Cir. 2015) (quoting *United States v. Wright*, 634 F.3d 770, 774 (5th Cir. 2011)). The instruction must be both "legally accurate" and "factually supportable"—"the court may not instruct the jury on a charge that is not supported by evidence." *Id.* (quoting *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003)). When counsel objected to the instruction at trial, the district court stated that it believed there was "evidence in the record supporting the charge," particularly because there was a "contention that this was a mistake or . . . there was evidence that [Juarez] would have had to have closed his eyes to what was there not to know what was going on."

"Due to concerns that a jury will convict a defendant for what [he] *should* have known rather than the appropriate legal standard, [this Court has] 'often cautioned against the use of the deliberate ignorance instruction.'" *United States v. Demmitt*, 706 F.3d 665, 675 (5th Cir. 2013) (quoting *Mendoza-Medina*, 346 F.3d at 132). A deliberate ignorance instruction is rarely appropriate; it should only be given "where the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful

---

[2] The district court used the Fifth Circuit Pattern Jury Instructions, which state:

You may find that the defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what . . . would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. *See* Fifth Circuit Pattern Jury Instructions (Criminal) § 1.37A (2015)).

contrivance to avoid learning of the illegal conduct." *United States v. Jones*, 664 F.3d 966, 979 (5th Cir. 2011). This Court has explained that "[t]he key aspect of deliberate ignorance is the *conscious* action of the defendant—the defendant *consciously* attempted to escape confirmation of conditions or events he strongly suspected to exist." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). "[T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *Id.* at 952.

### 1. *Subjective Awareness of a High Probability of Illegal Conduct*

On the first prong, the Government must present "facts that support an inference that the . . . defendant *subjectively* knew his act to be illegal." *United States v. Nguyen*, 493 F.3d 613, 619 (5th Cir. 2007). "The evidence should allow a 'glimpse' into the defendant['s] mind[] when there is no evidence pointing to actual knowledge." *Id.* at 619–20. "Suspicious and erratic behavior may be sufficient to infer subjective awareness of illegal conduct." *Id.* at 620.

Witnesses at trial testified to numerous instances of suspicious and erratic behavior that would support an inference Juarez knew about the drug conspiracy. Specifically, there was evidence of the following: Juarez regularly received payments in cash from Perez, and the two would meet exclusively at nightclubs to conduct transactions; on several occasions Juarez showed Perez and Efrain Grimaldo (Sergio Grimaldo's brother) firearms he had in his car and offered to sell them, although he never asked why Perez and Sergio Grimaldo might be in need of guns; he sold Sergio Grimaldo a bulletproof police vest; Juarez socialized at the Chaparral nightclub in the VIP section with the Grimaldos while they used cocaine; he explained to Sergio Grimaldo how to tell if he was being followed by law enforcement and identified several federal narcotics agents at a restaurant so Grimaldo would know who they were; and

Juarez used the code words that members of the drug conspiracy used. We find that this evidence was such that the jury could have found Juarez had actual knowledge or was at least subjectively aware of a high probability of illegal activity by the Grimaldos.

### 2. Purposeful Contrivance to Avoid Learning of Illegal Conduct

The second prong may be satisfied "[i]f the circumstances . . . were so overwhelmingly suspicious that the defendant['s] failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge." *Nguyen*, 493 F.3d at 621 (internal quotation marks omitted). "Not asking questions can be considered a purposeful contrivance to avoid guilty knowledge." *Id.* at 622. For example, in *Nguyen*, a case involving bank fraud and money laundering, we noted that the defendants engaged in multiple suspicious transactions "but *never* requested to examine the actual checks themselves," raising an inference that they "suspected or actually knew, but avoided further knowledge, about the non-existence of the down payment checks before the loans were dispersed." *Id.* at 621–22. This Court found that overall, the "sheer intensity and repetition in the pattern of suspicious activity coupled with [the defendants'] consistent failure to conduct further inquiry" created an inference that the defendants purposefully contrived to avoid further knowledge. *Id.* at 622.

Similarly, this case involves an overwhelmingly suspicious pattern of activity. As listed above, the conspirators testified about numerous occasions of socializing with Juarez, making cash payments to him, receiving his assistance in evading law enforcement, and purchasing firearms from him. These activities were apparently repeated and routine. And significantly, there was ample evidence that Juarez consistently failed to make inquiries regarding the suspicious nature of these dealings. Grimaldo testified that Juarez told him directly that "he didn't want to get involved in those types of issues," which

No. 16-30773

Grimaldo took to mean that Juarez wanted to do business but did not want to be involved in drug dealing. The combination of Juarez's routinely suspicious behavior and his continual lack of inquiry into what his associates would do with the firearms, cash, and vehicles suggests that he purposefully contrived to remain ignorant regarding the Grimaldos' drug conspiracy. Because the evidence supported a deliberate ignorance instruction, the district court did not abuse its discretion by giving the instruction to the jury.

## C.    Body-Armor Sentencing Enhancement

### 1. Application of U.S.S.G. § 3B1.5

Juarez next argues that his sentence should be vacated due to an incorrect application of U.S.S.G. § 3B1.5, which provides a sentencing enhancement when a defendant convicted of a drug trafficking crime or crime of violence uses body armor during the commission of the offense.[3] The Guidelines commentary defines "use" as "(A) active employment in a manner to protect the person from gunfire; or (B) use as a means of bartering." U.S.S.G. § 3B1.5 cmt. n.1. The commentary further notes that "'[u]se' does not mean

---

[3] The full provision reads:

If—

(1) the defendant was convicted of a drug trafficking crime or crime of violence; and

(2) (apply the greater)—

    (A) the offense involved the use of body armor, increase by 2 levels; or

    (B) the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense, increase by 4 levels.

U.S. Sentencing Guidelines Manual § 3B1.5 (U.S. Sentencing Comm'n 2015).

mere possession (*e.g.*, 'use' does not mean that the body armor was found in the trunk of the car but not used actively as protection)." *Id.*

The presentencing report ("PSR") stated that Juarez had sold two bulletproof vests to Efrain Grimaldo and Sergio Grimaldo, and these "vests were stored in one of the Houston stash houses, where drugs, drug proceeds, and firearms were kept." The PSR recommended a four-level enhancement based on this conduct. Counsel for Juarez filed a written objection, arguing that the vests were never "used" in furtherance of the conspiracy as required by the Guidelines provision. The district court disagreed. The court found that Juarez "sold bullet-proof vests to at two least co-conspirators" and that "[a]lthough the Application Note to the guideline does not explicitly include the phrase 'sell' in its definition of 'use,' . . . it is not inconsistent with the purposes of the sentencing guidelines to interpret 'use' and 'barter' as an exchange of body armor for money." The application of § 3B1.5 increased Juarez's Guidelines range from 188–235 months' imprisonment to 292–365 months' imprisonment, and Juarez was sentenced to 365 months' imprisonment. Juarez presses his argument on appeal that he did not "use" body armor as defined because there is "no evidence that Mr. Juarez or anyone else in the conspiracy actively employed the body armor for protection while committing acts in furtherance of the conspiracy."

"When a defendant objects to a sentencing enhancement, this court 'reviews the district court's interpretation and application of the Guidelines *de novo* and its factual findings for clear error.'" *United States v. Sanchez*, 850 F.3d 767, 769 (5th Cir. 2017) (per curiam) (quoting *United States v. Johnson*, 619 F.3d 469, 472 (5th Cir. 2010)). "We analyze the Guidelines under the rules that apply to the interpretation of statutes." *United States v. Mendez-Villa*, 346 F.3d 568, 570 (5th Cir. 2003) (per curiam). "The text of the guideline is the

starting point in the analysis; the commentary is considered authoritative," and we should use a "plain-meaning approach" in our interpretation. *Id.*

The plain language of § 3B1.5 precludes its application to the sale of body armor. The provision states that "use" either means "active employment in a manner to protect the person from gunfire"—which is plainly inapplicable—or "use as a means of bartering." U.S.S.G. § 3B1.5 cmt. n.1. Juarez was not "bartering" by selling body armor. This Court has defined "barter" to mean "the exchange of one commodity for another without the use of money." *United States v. Hagman*, 740 F.3d 1044, 1050–51 (5th Cir. 2014) (quoting *Barter*, Black's Law Dictionary (9th ed. 2009)) (finding that the defendant's "alleged attempt to exchange money for the eleven missing firearms [did] not constitute bartering" under 18 U.S.C. § 922(j), which proscribes bartering with stolen firearms). Indeed, the Sentencing Commission could have chosen to apply the enhancement to selling as well as bartering, as other provisions make enhancements dependent on "pecuniary gain" or conduct "motivated by payment or offer of money or other thing of value." *See* U.S.S.G. §§ 2G2.2(b)(3)(A), 2A2.2(b)(5).

The Government, while acknowledging that the plain language does not apply to Juarez's conduct, argues that excluding the sale of body armor from the definition "would go against both the purpose of the guideline and common sense." The Government contends that it would be unreasonable to apply the provision to the "exchange of body armor for firearms, but not to the exchange of the same body armor for one dollar." But the Government has no authority for its position; to date, this Court and others have only applied the body-armor enhancement where the defendant committed a crime *wearing* body armor. *See, e.g.*, *United States v. Cervantes*, 706 F.3d 603, 620–21 (5th Cir. 2013); *United States v. Roush*, 527 F. App'x 349, 351 (6th Cir. 2013); *United States v. Matthew*, 451 F. App'x 296, 296–97 (4th Cir. 2011) (per curiam); *United States*

*v. Shamah*, 624 F.3d 449, 759 (7th Cir. 2010); *United States v. Barrett*, 552 F.3d 724, 727–28 (8th Cir. 2009); *United States v. Chambers*, 268 F. App'x 707, 712 (10th Cir. 2008); *United States v. Douglas*, 242 F. App'x 324, 330 (6th Cir. 2007).

We decline to expand the application of a Guideline when doing so would be plainly inconsistent with the Guideline's language. Thus, we find that the district court erred in applying the body-armor enhancement.

### 2. *Harmless Error*

Because we find there was a sentencing error, we must determine whether that error was harmless. "[E]ven when a court does not consider the proper sentencing range, 'an error in the guidelines calculation can still be considered harmless.'" *United States v. Martinez-Romero*, 817 F.3d 917, 924 (5th Cir. 2016) (per curiam) (quoting *United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012)). But it is the Government's "heavy burden" to prove that (1) "the district court would have imposed a sentence outside the properly calculated sentencing range for the same reasons it provided at the sentencing hearing" and (2) "the sentence the district court imposed was not influenced in any way by the erroneous Guidelines calculation." *Id.* (internal quotation marks omitted).

In *Martinez-Romero*, the district court improperly added a 16-level enhancement—altering the Guidelines range from 18–24 months to 46–57 months—and sentenced the defendant to 46 months' imprisonment. *Id.* at 924–25. While there was "no record evidence that the district court considered the lower, correctly calculated guideline range," the district court nonetheless made three clear statements at the sentencing hearing that even if the enhancement had been incorrectly applied, the court still would have imposed the same 46-month sentence. *Id.* The district court elaborated on its decision, pointing out other similar crimes the defendant had committed, aggravating

circumstances of those crimes, and the defendant's prior conviction for breaching the peace. *Id.* at 925. The court further commented that the defendant's conduct had been "very disturbing" and that the court had considered the factors under 18 U.S.C. § 3553(a) in reaching its decision. *Id.*

On appeal, we were satisfied that the district court would have imposed a sentence higher than one within the correctly calculated range "for the same reasons it provided at the sentencing hearing" but not that the defendant's sentence "was not influenced in any way by the erroneous Guidelines calculation." *Id.* at 925–26. Because the imposed sentence "coincide[d] with the lowest end of the improperly calculated guideline range," we found it "a stretch to say that the court's choice of the same parameters as the improperly calculated guidelines range . . . was mere serendipity." *Id.* at 925–26. It was clear that the improper calculation was what "called the court's attention to that range in the first instance." *Id.* at 962. Accordingly, we found the error was not harmless. *Id*; *see also United States v. Rico-Mejia*, 859 F.3d 318, 324–25 (5th Cir. 2017) (finding a sentencing error not harmless when the imposed sentenced corresponded precisely to the bottom of the incorrect guidelines range and the Government was "unable to convincingly show that the sentence imposed on [the defendant] was uninfluenced by the erroneous Guidelines calculation").

In the instant case, the district court stated the following at sentencing:

> The Court also notes that it would impose this same sentence even if it had sustained the defendant's objection to the adjustment under Sentencing Guideline 3B1.5(2)(B) for the use of body armor.

> The Court finds that if that section did not apply in this case, then the guideline would not have appropriately captured the defendant's conduct. By selling body armor to drug traffickers, defendant protected armed, dangerous criminals and increased the danger they posed to law enforcement and others.

If there is a distinction between a sale and a barter, the Court doesn't see[] any meaningful distinction in terms of the harm caused in this case by the . . . supplying of the body armor.

The Court finds for these reasons that if Section 3B1.5(2)(B) did not apply to defendant's conduct, an upward variance would be warranted, and the defendant's sentence would remain unchanged.

These statements by the district court are similar to those in *Martinez-Romero* and *Rico-Mejia*. As in *Martinez-Romero*, there was no clear evidence that the court considered the correct range. Nor was there any "indication that the court's decision to select the exact . . . high end[] of the improper range was independent of the erroneous calculation that called the court's attention to that range in the first instance." *Martinez-Romero*, 817 F.3d at 926. Unlike in those cases, however, the district court here sentenced Juarez to the *top* of the erroneously-calculated Guidelines range. We find that while the Government has proved that the district court would have departed from the correct range, it has not convincingly shown that the 365-month sentence was not influenced by the improperly calculated range. The Government has thus not met its heavy burden to prove harmless error.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Juarez's conviction but VACATE his sentence and REMAND for resentencing.