# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30627

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RODNEY HESSON, also known as Psy.D.; GERTRUDE PARKER,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:15-CR-152-1

Before CLEMENT, HIGGINSON, and HO, Circuit Judges.

PER CURIAM:*

Defendants Rodney Hesson and Gertrude Parker were charged with conspiracy to perpetrate a Medicare fraud scheme as CEOs of two companies—Nursing Home Psychological Services ("NHPS") and Psychological Care Services ("PCS"). Under their leadership, the companies implemented policies directing psychologists to overbill Medicare for the services they provided. After a six-day jury trial, they were each found guilty of conspiracy to commit

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

health care fraud in violation of 18 U.S.C. § 1349 and conspiracy to make false statements related to health care claims in violation of 18 U.S.C. § 371.

Hesson and Parker raise numerous issues on appeal, but none persuades. Accordingly, we affirm.

I

Hesson was the owner and CEO of NHPS, which he purchased in 2008. The company partnered with nursing homes and sent psychologists to administer psychological exams and consultations to their residents. NHPS employees known as "clinical coordinators" worked with nursing homes to identify the residents in need of the company's services. NHPS maximized the number of residents using its services by, for example, setting a low bar to qualify a resident for testing, paying coordinators per referral, and proactively scheduling subsequent evaluations at the earliest date allowed by Medicare.

NHPS's service was streamlined. Clinical coordinators, who had no psychological degrees, would put together a small file on each patient and then administer the same three basic tests, which required no specialized training and lasted no more than 10–15 minutes each. After the test was administered, the patient would briefly speak with a psychologist, who would review the test results and ask additional questions. The conversation would culminate in a treatment recommendation and short-form write-up. An assistant would then convert the psychologist's notes into a longer report, a process which usually took 30–35 minutes. The psychologist would review the report, editing as necessary, and then fill out a billing form to be submitted to Medicare.

There is significant evidence in the record that the company's policies and culture were focused on its financial interests, not quality of care. Patients with Medicaid coverage would not receive the tests and could expect only a brief consultation because NHPS did not receive reimbursement. By contrast,

Medicare recipients—for whose service NHPS would receive reimbursement—were seen as often as permitted, regardless of the helpfulness of the repeated visits. Many patients, for example, had mental disabilities so severe they could not complete the exams, yet were seen on a quarterly basis. Indeed, the tests themselves were not particularly probing for those who *could* complete them.

NHPS's billing statements to Medicare did not reflect its economized system. The billing forms used the Medicare code 96101, reimbursing "[p]sychological testing per hour of the psychologist's or physician's time, both face-to-face time administering tests to the patient and time interpreting these test results and preparing the report." Despite the fact that psychologists spent little time with patients (one estimated as little as 30 minutes) or preparing their reports, they consistently reported five to eight hours per patient. As a result, the doctors would report "impossible hours"—i.e., more hours of work than physically possible in a given day. NHPS also included the work done only by assistants. Medicare paid NHPS $6.49 million on claims between 2009 and 2012.

Hesson, himself a practicing psychologist at the time, was at the center of NHPS's policy. Hesson's company-wide target was for physicians to complete 10 to 15 patient evaluations during a single workday. He also discouraged psychologists from spending time engaging in substantial edits to the assistants' reports. Under his leadership, psychologists were paid flat fees per patient seen, incentivizing them to spend as little time as possible with patients. He also encouraged psychologists to provide treatment recommendations that were the least burdensome to the homes.

Hesson also enforced the company-wide billing policy. He emphasized the importance of billing at least four hours of work per patient to maintain the company's financial health. Internal reviews on this issue were

undertaken, and Hesson would reach out to doctors charging less to "encourage" them to charge more time. Those who continued to report lower hours risked having pay withheld or contracts terminated. And he practiced what he preached. Indeed, at one point, Hesson was seeking reimbursement for 78–90 hours of work per day.

In June 2011, Hesson was charged with 11 counts of Medicaid fraud in connection with his private practice (not NHPS). This precipitated certain policy changes at NHPS. For example, psychologists were required to complete the tests, and he capped the number of evaluations a doctor could give per day (albeit still at a high number). The indictment also led to his decision to sell the company to Parker, his mother, who purchased NHPS for $500,000. Hesson pleaded guilty twelve days later [and lost his license.

NHPS's name changed to PCS, but Parker ran the company exactly as Hesson had. She kept the same model and practices in effect, and improved on the system's profitability—by, for example, seeking to expand the business, imposing a ten-referral-per-visit minimum on nursing homes, and researching the residents with Medicare in advance. PCS received $7.3 million in Medicare reimbursements between 2012 and 2015.

Parker made financial and management decisions for PCS and ran the day-to-day operations. She also maintained pressure on the psychologists to bill the appropriate number of hours, and confronted those who did not. Despite his fraud conviction, Hesson was an active figure in the new company. Upper management meetings were held at his house during the transition, at which he would voice opinions on administrative matters. And he remained a constant advisor on PCS billing policies and other important decisions.

On October 22, 2015, a grand jury returned a superseding indictment charging Hesson, Parker, and two high-ranking employees in NHPS/PCS—

No. 17-30627

Beverly Stubblefield and John Teal—with conspiracy to commit health care fraud (18 U.S.C. § 1349) and conspiracy to make false statements related to health care matters (18 U.S.C. § 371). Stubblefield and Teal pleaded guilty to the first charge, while Hesson and Parker proceeded to trial.

The trial lasted six days and included testimony from Stubblefield, Teal, Hesson himself, as well as several other employees and expert witnesses. Hesson and Parker were found guilty as charged. The jury also returned a special verdict for the forfeiture of certain property, and the court then issued a preliminary order of forfeiture on May 11, 2017. In July 2017, Hesson and Parker were sentenced to 180 months and 84 months imprisonment, respectively, and three years of supervised release. The court also ordered that they pay $13,800,533.57 and $7,313,379.75 in restitution. In response to the Government's motions, the court entered amended judgments the next month, incorporating the forfeiture order and clarifying that all four conspirators were jointly and severally liable for the restitution.

II

Hesson and Parker appeal various issues, both jointly and individually, from all stages of the proceedings below. We consider each in turn.

A. *Voir Dire Challenge*

Hesson and Parker first argue that the district court abused its discretion when it did not permit defense counsel the opportunity to ask certain follow-up questions during voir dire.

During questioning, Hesson's attorney notified the prospective jurors of Hesson's prior Medicaid fraud conviction and informed them that it would come out during the trial. He asked whether any members might "be more likely to vote guilty" after learning of this prior conviction. Ten answered in the affirmative. The court then educated the jury on the use of the evidence. It

5

emphasized that the prior crime was "a totally different offense, a different time, a different place," and that its use would be "very limited." The court warned that the prior conviction "is not a basis on which the jury is to find that the defendant committed the offense charged." It then asked the ten jurors, "Anybody not understand that?" None responded, and defense counsel moved on.

The court later "want[ed] to make sure" that the ten jurors would be able to remain impartial, so it again asked whether they still might not be capable of avoiding improper inferences. Three of the original ten jurors raised their hands. Those three were then questioned individually by the court and struck. The court concluded that there was no need to talk to the remaining seven. Defense counsel objected to this decision, but the court explained that it was "satisfied from their response to" its questions.

None of the seven jurors was chosen for the jury. One was excused for hardship, while the remaining were peremptorily struck by the defense, which was given eleven strikes total. When the defense then raised the issue again on a motion for new trial, the court again affirmed its conclusion, and noted that, regardless, "[d]efendants were not deprived of a fair trial because none of the rehabilitated jurors ultimately served on the jury."

Trial courts have discretion to define the shape and scope of voir dire, *see* Fed. R. Crim. P. 24(a), "subject to the essential demands of fairness." *United States v. Delval*, 600 F.2d 1098, 1102 (5th Cir. 1979). That discretion includes resolving "who will question potential jurors and what questions will be asked." *United States v. Harper*, 527 F.3d 396, 409 (5th Cir. 2008) (internal quotation omitted). It also "extends both to the decision whether or not to submit suggested questions to the jury and to the decision whether to question prospective jurors collectively or individually." *Delval*, 600 F.2d at 1102

(internal citations omitted). We review only for clear abuses of that discretion. *United States v. Rasco*, 123 F.3d 222, 231 (5th Cir. 1997).

An adequate voir dire protects a defendant's constitutional right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 729–30 (1992). Accordingly, it must allow attorneys an adequate opportunity to identify and remove impartial jurors for cause or through use of peremptory strikes. *Delval*, 600 F.2d at 1102 ("Full and complete voir dire is . . . necessary for the adequate development of any facts requiring the removal of a juror for cause as well as for the intelligent exercise of peremptory challenges."). The requirement is not onerous, however: the voir dire must simply "produce some basis for defense counsel to exercise a reasonably knowledgeable right of challenge," *United States v. Rodriguez*, 993 F.2d 1170, 1176 (5th Cir. 1993), or "a reasonable assurance that prejudice would be discovered if present," *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) (internal quotation omitted). We have held that this assurance is not provided where the court has so intimidated panel members that their answers could not be trusted as authentic, *see United States v. Rowe*, 106 F.3d 1226, 1228–30 (5th Cir. 1997), or when the court fails to permit any inquiry into crucial topics, *see, e.g.*, *Morgan*, 504 U.S. at 733–35 (inquiry whether potential jurors would "be unalterably in favor of" imposing the death penalty required in capital cases).

As our account of the voir dire makes clear, such are not the circumstances here. The district court not only permitted defense counsel to inquire into the effect of Hesson's prior conviction, it proactively assisted that inquiry. The court educated the panel members about the legal standards governing the use of such evidence and repeated the question. And, even after all of the members that initially expressed concerns communicated that they had been assuaged, the court, on its own initiative, again asked those members

No. 17-30627

to ensure their promise to remain impartial was authentic. The court's second inquiry unearthed lingering doubts in three potential jurors, who were immediately struck.

We are satisfied that the district court oversaw a full and robust inquiry regarding a potential source of bias, eliciting answers from panel members who clearly felt free to speak candidly. *Cf. United States v. Huerra*, 884 F.3d 511, 518 (5th Cir. 2018) (no intimidation where "panel was not hesitant to disclose its potential biases"); *Delval*, 600 F.2d at 1103 (no intimidation when at least some panel members admit bias). Defense counsel were left with seven jurors who had twice affirmed that they could remain impartial. No further inquiry was needed. The court's scrupulous conduct afforded defense counsel a more-than-adequate basis for discerning potential bias. We see no reason to overturn the district court's management of the voir dire.

*B. Admissibility of Hesson's Prior Medicaid Conviction*

Defendants objected to the use of Hesson's 2011 Medicaid fraud conviction before trial, arguing it was inadmissible evidence of other wrongs under Federal Rule of Evidence 404(b). The district court was not persuaded. At trial, the Government introduced both the charge and Hesson's guilty plea and questioned several witnesses about the incident—including Hesson himself.

Defendants now appeal the district court's decision to admit the conviction. Evidentiary decisions are reviewed for abuse of discretion, *United States v. Lucas*, 849 F.3d 638, 642 (5th Cir. 2017), "although [the court] employ[s] a heightened review in criminal cases," *United States v. Jimenez-*

8

*Elvirez*, 862 F.3d 527, 535 (5th Cir. 2017). We again see no abuse; the evidence meets the requirements of Rule 404(b).[1]

In order to be admissible, prior conviction evidence must survive a two-step inquiry. First, the evidence must be "relevant to an issue other than the defendant's character." *Id.* at 536 (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)). As Rule 404(b) clarifies, other issues include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Federal Rule of Evidence 403." *Jimenez-Elvirez*, 862 F.3d at 536 (quoting *Beechum*, 582 F.2d at 911) (cleaned up).

At step one, Hesson's 2011 state conviction for Medicaid fraud is clearly relevant to an issue unrelated to his character. Hesson pleaded guilty to knowingly submitting "false, fictitious, and fraudulent" claims for reimbursement from Medicaid. *See* MISS. CODE ANN. § 43-13-213. In other words, the charges relate to a distinct, yet substantially similar scheme involving a similar fraudulent practice and the same intent to defraud a government health care program. *See United States v. Cockrell*, 587 F.3d 674, 678 (5th Cir. 2009) ("The relevance of extrinsic act evidence is a function of its similarity to the offense charged." (internal quotation omitted)). Accordingly, his guilty plea is relevant to establish a culpable state of mind in the fraud alleged here. *See United States v. Smith*, 804 F.3d 724, 736 (5th Cir. 2015) ("[A] [prior] offense is relevant to intent . . . if it requires the same intent as the charged offense, because evidence of the [prior] offense then lessens the

---

[1] In so holding, we express no opinion on the district court's ruling that this evidence was admissible because it was intrinsic to the defendants' crimes.

likelihood that the defendant committed the charged offense with innocent intent." (internal quotation omitted)); *see also Jimenez-Elvirez*, 862 F.3d at 536; *Beechum*, 582 F.2d at 911.

We next examine whether the probative value of the evidence is substantially outweighed by the dangers of unfair prejudice. *See* Fed. R. Evid. 403. We look to four factors when conducting this balancing: "(1) the [G]overnment's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." *United States v. Kinchen*, 729 F.3d 466, 473 (5th Cir. 2013).

We acknowledge that the admission of 2011 Medicaid fraud prejudiced Hesson to some degree. The frauds were similar and occurred simultaneously. *See Cockrell*, 587 F.3d at 679 ("[T]he more closely the extrinsic offense resembles the charged offense, the greater the prejudice to the defendant . . . ." (internal quotation omitted)). Nevertheless, its prejudice did not substantially outweigh its probative value.

For one, the 2011 fraud provided evidence not only of Hesson's criminal intent, but also that of Parker. After all, despite her awareness of the prior conviction, Parker relied on him as an important advisor to the company and continued his reporting scheme after she bought his company. Notably, both defendants contested criminal intent at trial. *See Kinchen*, 729 F.3d at 473 (prejudice weighs more heavily when the applicable 404(b) exception is uncontested). Moreover, the similarity between the 2011 fraud and the present crime increases the prior crime's probative value. *Jimenez-Elvirez*, 862 F.3d at 536. Conversely, the prejudice Hesson suffered is substantially mitigated by the court's thorough mitigating instructions during voir dire and in its jury instructions. *See id.* at 537. The crime was "not of a heinous nature," *Smith*,

804 F.3d at 736 (internal quotation omitted), and it was not "greater in magnitude than the crimes for which [the defendants were] on trial, nor did [it] occupy more of the jury's time than the evidence of the charged offense[]"—"hallmarks of highly prejudicial evidence." *United States v. Juarez*, 866 F.3d 622, 629 (5th Cir. 2017) (internal quotation omitted).

Accordingly, the district court did not abuse its discretion when it admitted evidence of Hesson's 2011 fraud.

*C. Admissibility of Expert Testimony*

Defendants next contest the admission of expert testimony from Daniel Marson, a clinical neuropsychologist, because he was permitted to opine on the ultimate issue of the defendants' state of mind in violation of Rule 704(b). Here again, we discern no abuse of discretion.[2]

Marson is a clinical neuropsychologist and professor of neurology with extensive clinical practice "in the cognitive and emotional assessment of older adults with all forms of dementia." He is well-acquainted in the administration of the sort of psychological assessments that NHPS/PCS provided as well as related Medicare reporting requirements. [Id.]

In its pre-trial submission, the Government noted that Marson had evaluated the medical files of eleven NHPS/PCS patients and other related records. The submission also reported Marson's resulting conclusions, which strongly criticized NHPS and PCS both for imposing "clinically inappropriate" evaluations and overbilling Medicare for such services. His trial testimony

---

[2] We note that the Government contends on appeal that plain error review should apply. It argues that, although the defendants timely objected to Marson's testimony during the proceedings below, it was not on the specific basis raised on appeal. The defendants disagree with this interpretation of its objections, contending we should review for abuse of discretion. Because we affirm under the less deferential standard of review, we need not resolve this dispute.

focused on this material. When asked to summarize his overall opinion of NHPS's/PCS's practices based on his total evaluation of the record, Marson stated, "it's the most egregious case of inappropriate psychological care and billing of older adults that I've seen in 27 years of practice."

Marson also discussed certain emails written by Teal and Stubblefield directing psychologists to bill hours according to the company's policy. Marson opined that the statements in these emails offered medically unethical guidance and evinced a desire for profits instead of proper diagnoses. He also believed the authors intended to apply "subtl[e] pressur[e]" on the psychologists to comply.

Rule 704(b)'s limitation is quite narrow. As this court has explained, it only "prohibits experts from testifying as to . . . whether the defendant did or did not have the requisite state of mind" to be convicted of the crime, *United States v. Dotson*, 817 F.2d 1127, 1132 (5th Cir.), *aff'd in pertinent part on reh'g*, 821 F.2d 1034 (1987), or "the functional equivalent," *United States v. Gutierrez-Farias*, 294 F.3d 657, 663 (5th Cir. 2002). Experts are still, however, permitted to analyze evidence and offer conclusions that would have a bearing on that issue. *United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994).

Marson's testimony does not run afoul of this requirement. Indeed, the majority was entirely unrelated to mental states. For example, he largely discussed and evaluated the propriety of the psychological reports and Medicare reporting he reviewed. Even those parts of his testimony relating to intent—e.g., his interpretation of emails—never broached the ultimate mens rea issue here: that either Parker or Hesson "knowingly and willfully" defrauded Medicare or so conspired. He never, for example, opined or attempted to infer whether the two were aware of Medicare standards. Instead, he merely observed that the emails did not evince a proper concern for the

12

welfare of patients and imposed an internal pressure on psychologists to comply with company policy. To the extent mental state is implicated by such statements, it is not the intent required for conviction. More fundamentally, the emails were not written by the defendants, so his opinions do not directly concern their mental state.

And, even if the admission of any part of this testimony was error, it was harmless. The evidence of guilt here was overwhelming; this was "only a small portion of an otherwise strong case." *Gutierrez-Farias*, 294 F.3d at 663. Marson's testimony was brief; it took up a small portion of the six-day trial. Moreover, there was significant evidence of guilt—including the Medicare reports that were plainly fraudulent, emails authored by the defendants themselves, and testimony from co-conspirators, who had pleaded guilty to the charges and testified against the defendants. There is, accordingly, "no reasonable probability that the conviction hinged on" Marson's testimony. *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 368 (5th Cir. 2010).

*D. Motion to Sever*

Parker claims that the denial of her motion to sever her trial from Hesson's was in error. Her argument fails to meet the "exceedingly deferential abuse of discretion standard" the denial of a motion to sever receives. *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009) (internal quotation omitted). It requires "a showing of specific and compelling prejudice," which includes the "harmful spill-over of evidence against other defendants." *United States v. Erwin*, 793 F.2d 656, 665 (5th Cir. 1986) (internal quotation omitted). Notably, limiting instructions are usually "sufficient to prevent the threat of prejudice resulting from unsevered trials." *United States v. Massey*, 827 F.2d 995, 1005 (5th Cir. 1987).

The only prejudice Parker mentions is the introduction of a single piece of evidence: Hesson's Medicaid conviction. As already noted, the conviction was relevant to Parker's participation in the conspiracy, so it was likely admissible as to both defendants. Even if not, such spill-over evidence alone is an insufficient basis for severance. *United States v. Snarr*, 704 F.3d 368, 397 (5th Cir. 2013). And, more pointedly, this court has held that past convictions of co-defendants usually do not justify severance even if inadmissible against other defendants. *United States v. Rocha*, 916 F.2d 219, 228 (5th Cir. 1990); *compare Erwin*, 793 F.2d at 665–66 (severance required for individual who was only peripherally involved in complex conspiracy and for whom "very little of the mountainous evidence was usable"). Moreover, whatever prejudice it might have caused was cured by the court's limiting instructions.

This is, in short, not one of the exceptional circumstances justifying divergence from the general rule "that persons indicted together should be tried together, especially in conspiracy cases." *United States v. McRae*, 702 F.3d 806, 821 (5th Cir. 2012) (internal quotation omitted).

*E. Sufficiency of the Evidence against Parker*

Parker also appeals the denial of her motions for judgment of acquittal based on the sufficiency of the evidence, which were raised at the end of the Government's case and after trial. The court reviews the sufficiency of evidence de novo, *United States v. McElwee*, 646 F.3d 328, 340 (5th Cir. 2011), but this review is limited, *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999). The court must review all of the evidence, "whether circumstantial or direct, in the light most favorable to the [G]overnment, with all reasonable inferences and credibility choices to be made in support of the jury's verdict, to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grant*, 683 F.3d 639, 642

14

(5th Cir. 2012) (internal quotation omitted). Notably, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *Moreno*, 185 F.3d at 471. Each element of a charge may be inferred by circumstantial evidence. *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014).

Conspiracy for health-care fraud requires that "(1) two or more persons made an agreement to commit health care fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Gibson*, 875 F.3d 179, 185–86 (5th Cir. 2017). Conspiracy to make false statements relating to health care matters requires proof of "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009).

The main thrust of Parker's argument is the absence of testimony or other direct evidence that she was aware that PCS was perpetrating a fraud. She notes, for example, that none of the Government's witnesses testified that Parker instructed them to engage in fraud. Accordingly, she argues that the Government's case was flawed insofar as it relied solely on Parker's familial relationship with Hesson and her proximity to the scheme. *See United States v. Maltos*, 985 F.2d 743, 746–47 (5th Cir. 1992); *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978).

But, "conspirators may have a silent and informal agreement. Indeed, the voluntary participation may be inferred from a collection of circumstances,

and knowledge may be inferred from surrounding circumstances." *Willett*, 751 F.3d at 339 (internal quotation omitted). And when "inferences drawn from the existence of a family relationship or mere knowing presence are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction." *United States v. Soape*, 169 F.3d 257, 264 (5th Cir. 1999) (internal quotation omitted). Moreover, when an individual holds a position of authority within a company and remains within "proximity to the fraudulent activities," it is evidence that the defendant was aware of malfeasance within that company. *Willett*, 751 F.3d at 340. A similar inference is permissible when the individual fails to take remedial action in response to an employee's concerns about company practices. *Id.* at 342. But the Government must still provide "testimonial or documentary evidence" to support an inference of awareness. *United States v. Ganji*, 880 F.3d 760, 777 (5th Cir. 2018).

The evidence here is sufficient. We begin with the most damning evidence, which shows Parker knew that PCS's practice led to reports that were dishonest. Stubblefield, a co-conspirator who served as a director overseeing the billing practice, testified that she had conversations with Parker discussing the fact that the company would make less money if the doctors "charged [Medicare for] what they actually did." Additionally, the record shows that Parker was a repeated advocate of the four-hour-per-patient minimum, yet, within weeks of one such statement of company policy, she received a note from a psychologist who informed her that she had performed seven such "four-hour" interviews in a single day. Finally, she was made privy to multiple complaints from psychologists claiming the company's practice was unethical—including one who resigned over the issue.

16

As the Government points out, Parker was not only the CEO and founder of PCS, she was an active leader in its operations, including the company's billing practices. And her participation in its operation was frequently in concert with co-conspirators. For example, she conducted trainings with co-conspirators on the policy herself and demonstrated an extensive knowledge of Medicare practices. There is also evidence that she took a particularly active role with co-conspirators in enforcing the company's billing practices. Sometimes she confronted doctors herself, but she was often at least copied (again, with co-conspirators) on emails discussing decisions to fire psychologists for low billing practices or attempting to pressure psychologists to bill more hours.

In addition, Parker's relationship with Hesson, her son and co-conspirator, during the transition from NHPS to PCS is damning. Notably, Parker kept Hesson on as an advisor and sought his advice on management decisions—including those relating to billing—despite his fraud conviction. Moreover, there was clear evidence that Parker and PCS sought to merely pick up where Hesson and NHPS left off. Transition emails from Parker praised Hesson as the "man who invented this wheel" without any mention of his disgraced standing. She was copied on (and replied to) emails that strongly suggested PCS intended to "weed out" psychologists who were not bringing in enough Medicare reimbursements. And, under her leadership, PCS not only maintained NHPS's practices, it implemented new questionable policy choices, such as the ten patient referral minimum.

Construing all inferences in the Government's favor, there was a sufficient evidentiary basis for the jury to convict Parker for her role. There was ample evidence indicating her awareness of, authority over, proximity to,

and complicity with a fraudulent scheme, which she perpetrated in concert with co-conspirators. The conviction, in short, had a rational basis.[3]

*F. Deliberate Ignorance Instruction*

Parker next challenges the court's use of a deliberate ignorance instruction. Defense counsel timely objected, so we review the decision for abuse of discretion. *United States v. Kuhrt*, 788 F.3d 403, 416–17 (5th Cir. 2015). We again discern no such abuse.

The deliberate ignorance instruction allows juries to "consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *Gibson*, 875 F.3d at 196 (internal quotation omitted). But it comes with a risk prejudicial to the defendant: the application of a less strict mens rea requirement. *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003) ("Because the instruction permits a jury to convict a defendant without a finding that the defendant was actually aware of the existence of illegal conduct, . . . a jury might convict [him] on a lesser negligence standard . . . ." (internal quotation omitted)).

Accordingly, the instruction is only permissible when the defendant claims she was ignorant of wrongdoing and there is sufficient evidence for the instruction. *Gibson*, 875 F.3d at 196–98. Regarding the latter requirement, "[t]he evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal

---

[3] The foregoing demonstrates that defendants' reliance on *Ganji*—a case in which we overturned a conviction for conspiracy to commit health care fraud as to a specific defendant—is misplaced. In *Ganji*, we noted that there was no evidence from co-conspirators testifying as to "the actions the defendant took to meet their common unlawful goal." 880 F.3d at 771. Further, there was no "testimonial or documentary" evidence to support the inference that the defendant had knowingly engaged in fraud. *Id.* at 777–78. The Government's case here does not suffer from the same infirmities.

conduct." *United States v. Lara–Velasquez,* 919 F.2d 946, 951 (5th Cir. 1990) (internal quotation omitted). Notwithstanding this court's reluctance to apply the instruction, it "view[s] the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government." *United States v. Brooks*, 681 F.3d 678, 701 (5th Cir. 2012) (internal quotation omitted and alteration omitted). And, as we recently observed, this court has "repeated[ly] endorse[d]" deliberate ignorance instructions in health care fraud and conspiracy cases. *Gibson*, 875 F.3d at 197 (citing *United States v. Brown*, 871 F.3d 352, 355–56 (5th Cir. 2017)); *see also United States v. Sanjar*, 876 F.3d 725, 742 (5th Cir. 2017); *United States v. Barson*, 845 F.3d 159, 165–66 (5th Cir. 2016).

The present case presents the proper context for the instruction. Parker's supposed ignorance of the fraudulent scheme was a major theme in her defense. And there is evidence that she aware of a high probability of PCS's fraudulent billing while actively avoiding the truth.

Her awareness of a high probability of malfeasance is well-supported by the record. As noted, Parker not only owned PCS, she was thoroughly involved in the implementation and administration of the company's fraudulent billing practices. She received multiple complaints by psychologists that the company's billing policy was unethical, including at least one from a psychologist who resigned from PCS over the practice. She was also privy to emails in which Hesson—who she knew had pleaded guilty to Medicaid fraud for his reporting practices—communicated his intention to fire the objecting psychologist who resigned. Moreover, the co-conspirators who already had pleaded guilty to conspiracy to committing fraud, Teal and Stubblefield, were two of Parker's high-ranking employees overseeing and enforcing PCS's billing policy. One can infer from their confessions that Parker was at least aware

that the billing practices were likely illegal. *See United States v. St. Junius*, 739 F.3d 193, 205 (5th Cir. 2013).

Despite the evidence of malfeasance before her, Parker neither investigated nor questioned the company's billing practices. She did not attempt to intervene when Hesson communicated his intention to fire one of the objecting psychologists. When confronted with email complaints, she either did not respond or simply reinforced the company policy. Indeed, in one such email, Parker attempted to dissuade the individual from even raising such concerns. This inaction raises the prospect of willful blindness. *See United States v. Demmitt*, 706 F.3d 665, 676 (5th Cir. 2013) (noting that "failure to conduct further inspection or inquiry" to overwhelmingly suspicious information is evidence of "a conscious effort to avoid incriminating knowledge"); *Juarez*, 866 F.3d at 631 ("Not asking questions can be considered a purposeful contrivance to avoid guilty knowledge." (internal quotation omitted)).

In short, these are the precise circumstances for which deliberate ignorance instructions are appropriate: where the defendant "knew it was highly likely that something illegal was afoot, but tried looking the other way while reaping the benefits of the likely criminal activity." *Brown*, 871 F.3d at 356. Even if it were not, however, we would find this error harmless because we have concluded that there was substantial evidence that Parker had actual knowledge of malfeasance. *See Kuhrt*, 788 F.3d at 417.

*G. Restitution Order*

The initial judgment requiring restitution was issued on July 13, 2017. Parker filed her notice of appeal on July 26, 2017. The Government then filed a motion to amend the judgment to make Parker, Hesson, Stubblefield, and Teal jointly and severally liable for the restitution. The motion was granted on

August 3, 2017, and a new judgment was issued reflecting the change. Parker did not respond to the Government's motion; she did not object to the judgment; and she never filed a new notice of appeal.

Parker now argues that the amended judgment's addition of joint and several liability was improper in light of the Supreme Court's decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), which was handed down on June 5, 2017. But "[t]o secure appellate review of a judgment or order, a party must file a notice of appeal from that judgment or order." *Manrique v. United States*, 137 S. Ct. 1266, 1271 (2017); *see* Fed. R. App. P. 3(a)(1). Accordingly, because Parker failed to file a timely notice of appeal after the amendment was issued, the argument is waived. *Cf. United States v. McNeil*, 707 F. App'x 764, 765 (4th Cir. 2017) (dismissing sua sponte the appeal of an amended sentencing order under *Manrique* because no subsequent notice of appeal was filed).

*H. Cumulative Error*

Finally, we note in passing that the defendants have raised a "cumulative error" argument, arguing that they were subject to "an aggregation of non-reversible errors, *i.e.*, plain and harmless errors that do not individually warrant reversal," which, operating "cumulatively[,] den[ied] a [ ] constitutional right to a fair trial." *United States v. Isgar*, 739 F.3d 829, 841 (5th Cir. 2014) (internal quotation omitted). As the foregoing demonstrates, however, "there is nothing to accumulate." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc).

III

AFFIRMED.